Barbara A. JONES, and Douglas Kinney, Plaintiffs-Appellants-Cross Respondents, †

v.

DANE COUNTY and James E. Chorlton, Defendants-Respondents-Cross Appellants.

Court of Appeals

*No. 92–0946. Submitted on briefs July 9, 1993.—Decided July 20, 1995.*

(Also reported in 537 N.W.2d 74.)

†Petition to review denied.

892

893

894

900

902

903

904

907

For the plaintiffs-appellants-cross respondents the cause was submitted on the briefs of *Allen D. Reuter* and *Amy F. Scarr* of *Clifford & Reuter, S.C.* of Madison.

For the defendants-respondents-cross appellants the cause was submitted on the briefs of *Carroll Metzner, Robert J. Kasieta* and *David J. Pliner* of *Bell, Metzner, Gierhart & Moore, S.C.* of Madison.

Before Eich, C.J., Dykman and Sundby, JJ.

DYKMAN, J.[1] Barbara A. Jones and her son, Douglas Kinney, appeal from an order in which the trial court dismissed, on summary judgment motion, their action under 42 U.S.C. § 1983.[2] Barbara Jones's

---

[1] The case was assigned to this judge on May 24, 1995, pursuant to the court's internal operating procedures, which provide, in part: "In the event the opinion is assigned to a judge representing the minority view, the opinion will be reassigned by lot to a member of the majority." WIS. CT. APP. IOP VI(4)(i) (July 15, 1991).

[2] 42 U.S.C. § 1983 creates a civil action for deprivation of rights and provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

stepson, Leland Robby Jones, Jr., had been adjudged delinquent and was placed out of his home and under the supervision of Dane County for one year. During that time period, he resided in three different residential homes and a hospital. Toward the end of his supervision period, James E. Chorlton, the county social worker assigned to his case, placed Robby back in Barbara Jones's home where he later shot and severely injured her and Kinney. Barbara Jones and Kinney claim that Chorlton violated their procedural and substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution when Chorlton changed Robby's placement without first providing them with notice and an opportunity to file an objection with the court as required by § 48.357(1), STATS.[3] We conclude that the trial court properly dismissed the procedural due process claim because Chorlton's actions were random and unauthorized, and adequate postdeprivation state law remedies exist to afford Jones and Kinney the process that they are due. We also conclude that the trial court properly dismissed the substantive due process claim

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[3] Section 48.357(1), STATS., provides, in relevant part:

The person or agency primarily responsible for implementing the dispositional order may request a change in the placement of the child, whether or not the change requested is authorized in the dispositional order and shall cause written notice to be sent to the child or the child's counsel or guardian ad litem, parent, foster parent, guardian and legal custodian. . . . Any person receiving the notice under this subsection . . . may obtain a hearing on the matter by filing an objection with the court within 10 days of receipt of the notice. Placements shall not be changed until 10 days after such notice is sent to the court unless the parent, guardian or legal custodian and the child, if 12 or more years of age, sign written waivers of objection . . . .

because the state has no duty to protect persons from private violence when that person is not in custody. Accordingly, we affirm.

Jones and Kinney also appeal from a judgment in which a jury returned a verdict on a negligence claim in favor of Chorlton. They complain of numerous prejudicial errors and request a new trial in the interest of justice. We reject each of these asserted errors and conclude that a new trial is not warranted. Accordingly, we affirm.[4]

## BACKGROUND

In April 1981, Leland Robby Jones, Jr., was found to be a child in need of protection or services (CHIPS) and delinquent. The trial court ordered him placed under county supervision for one year and returned him to his mother's home. A psychological evaluation completed by Dr. Larry W. Zuberbier that same month indicated that Robby hated his stepmother, Barbara Jones, and that he could hurt her.

In October 1981, Robby was again found delinquent and placed under county supervision for a period of one year. He was initially sent to Wyeth House, a group home in Madison, Wisconsin, where he remained until December 1981. At that time, he was sent to Kettle Moraine Hospital to obtain drug dependency treatment. In February 1982, Robby was transferred to Thoreau House in Madison where he remained until July 1982 when he was sent to Bockari House, also in Madison, after repeatedly violating his conditions of probation and house rules. He also spent two weeks in

---

[4] Dane County and James E. Chorlton filed a cross-appeal in this matter. However, because we affirm the judgment and order, the cross-appeal is dismissed.

Kettle Moraine Hospital in April 1982 to obtain additional drug dependency treatment.

On August 27, 1982, without first providing notice pursuant to § 48.357(1), STATS., and over Jones's objections, Chorlton sent Robby to Jones's home to live. The court order requiring that Robby be placed outside of his home was still in effect. On September 7, 1982, Robby shot and seriously wounded Jones and Kinney.

Jones and Kinney commenced this action in October 1983 alleging negligence and violations of their constitutional rights under 42 U.S.C. § 1983. On January 7, 1991, the trial court dismissed the § 1983 claim on summary judgment motion. The case went to trial on the negligence claim and on October 28, 1991, the jury found that while Chorlton was negligent, his negligence was not a cause of Jones's and Kinney's injuries. Jones and Kinney appeal.

## SECTION 1983

Jones and Kinney argue that the trial court erred when it dismissed their claim under 42 U.S.C. § 1983 on summary judgment motion. According to Jones and Kinney, they have raised genuine issues of material fact as to whether Chorlton violated their rights to procedural and substantive due process. They claim that Chorlton's failure to comply with § 48.357(1), STATS., which requires notice before a juvenile's placement may be changed, resulted in their being deprived of their rights to liberty and property without due process of law as guaranteed by the Fourteenth Amendment. We disagree.

A grant of summary judgment is an issue of law which we review *de novo* by applying the same standards as employed by the trial court. *Brownelli v.*

*McCaughtry*, 182 Wis. 2d 367, 372, 514 N.W.2d 48, 49 (Ct. App. 1994). We first examine the complaint to determine whether it states a claim, and then the answer to determine whether it presents a material issue of fact. *Id.* If they do, we then examine the documents offered by the moving party to determine whether that party has established a *prima facie* case for summary judgment. *Id.* If it has, we then look to the opposing party's documents to determine whether any material facts are in dispute which would entitle the opposing party to a trial. *Id.* at 372-73, 514 N.W.2d at 49-50.

To state a § 1983 claim against Chorlton, Jones and Kinney must allege: (1) that the conduct of which they complain was committed while Chorlton was acting under color of state law; and (2) that such conduct deprived them of rights, privileges or immunities secured by federal law or the United States Constitution. *Hillman v. Columbia County*, 164 Wis. 2d 376, 402, 474 N.W.2d 913, 923 (Ct. App. 1991). The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." The due process clause is comprised of two components: procedural and substantive due process.

Three types of § 1983 claims exist under the due process clause of the Fourteenth Amendment: (1) a claim for a violation of a specific right protected by the Bill of Rights and incorporated by the due process clause; (2) a claim under the substantive component of the due process clause which bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them; and (3) a

procedural due process claim involving the deprivation of life, liberty or property without due process of law. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Under the procedural component, Jones and Kinney must show that they were deprived of a constitutionally protected interest in life, liberty or property without due process of law. *Irby v. Macht*, 184 Wis. 2d 831, 838, 522 N.W.2d 9, 11, *cert. denied*, 115 S. Ct. 590 (1994). Under the substantive component, Jones and Kinney must show that the state was constitutionally obligated, yet failed, to protect their interests in life, liberty or property. *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195 (1989). We address each claim in turn.

## 1. *Procedural Due Process*

■

Jones and Kinney argue that they have been deprived of their constitutionally protected interests in liberty and property without due process of law because Chorlton forced them to accept Robby back into their home without providing them with an opportunity for a hearing on the change in placement.[5]

---

[5] We question, without answering, whether § 48.357(1), STATS., creates constitutionally protected interests in liberty and property of which Jones and Kinney were deprived by Chorlton's failure to provide such notice. The Supreme Court has stated that one cannot have a property interest in mere procedures.

> Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement. . . . The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right.

Under a procedural due process analysis, the fact that Jones and Kinney may have been deprived of a protected liberty or property right does not, alone, mean that their constitutional rights have been violated. "The [procedural component of the] Due Process Clause does not prevent states from depriving persons of their life, liberty or property." *Irby*, 184 Wis. 2d at 842, 522 N.W.2d at 13. In procedural due process claims, what is unconstitutional is the deprivation of such a right without due process of law. *Zinermon*, 494 U.S. at 125. In other words, the constitutional violation is not complete when the deprivation occurs, but when the state fails to provide due process. *Id.* at 126. Thus, our inquiry will assume, *arguendo*, that Jones and Kinney were deprived of a protected right and instead, will focus on whether this deprivation occurred without due process of law.

Jones and Kinney argue that they were not provided with the process that they were due because they were not given notice of a change in placement pursuant to § 48.357(1), STATS., before Robby was placed in their home. The disposition of this issue depends upon an examination of "the procedural safeguards built into the statutory or administrative procedure . . . effecting the deprivation, and any remedies for errone-

*Olim v. Wakinekona*, 461 U.S. 238, 250-51 (1983) (footnote omitted). *See also Sandin v. Conner*, 115 S. Ct. 2293 (1995). While the legislature might have arguably created a constitutionally protected right through the use of mandatory language such as "shall" in § 48.357(1), *see, e.g., Robinson v. McCaughtry*, 177 Wis. 2d 293, 300, 501 N.W.2d 896, 899 (Ct. App. 1993), we doubt that Jones and Kinney are the intended beneficiaries of any alleged right and at most, Robby is the only person who may lay claim to a liberty or property right under this statute.

ous deprivations provided by statute or tort law." *Zinermon*, 494 U.S. at 126. Generally, the United States Constitution requires a hearing *before* a deprivation occurs. *Irby*, 184 Wis. 2d at 843, 522 N.W.2d at 13. But, when a deprivation of a right[6] has resulted from a random and unauthorized act of a state employee, providing meaningful predeprivation process is impracticable because the state cannot predict or anticipate when such acts will occur. *Id.*, 522 N.W.2d at 14. In such cases, due process is satisfied when the state makes available adequate postdeprivation remedies.[7] *Id.* This rule applies "no matter how significant the private interest at stake and the risk of its erroneous deprivation, [because] the State cannot be required constitutionally to do the impossible by providing predeprivation process." *Zinermon*, 494 U.S. at 129 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The dissent asserts that *Irby* is no longer precedential because of the United States Supreme Court's decision in *Sandin v. Conner*, 115 S. Ct. 2293 (1995). *Sandin* will probably not alter the analysis of whether a person received the process he or she is due in a procedural due process case. *Sandin* has modified the test for determining whether statutes or rules create constitutionally protected rights for prisoners. *Id.* at 2297-2300. Had *Sandin* existed when *Irby* was written, the Wisconsin Supreme Court might have concluded that Irby had no constitutionally protected right that

[6] This analysis applies to deprivations of liberty and property rights. *Zinermon v. Burch*, 494 U.S. 113, 132 (1990).

[7] However, a postdeprivation state remedy is not a defense to a procedural due process claim when the deprivation is caused by conduct performed in conformity with established state procedures rather than by a random and unauthorized action. *Hudson v. Palmer*, 468 U.S. 517, 532 (1984).

was infringed. But logic does not dictate that because we now use a different analysis for determining whether a prisoner has a constitutionally protected right, *Irby* is no longer precedential. The subsequent analysis in *Irby*, in which the court concluded that Irby had received all of the process he was due because of the availability of adequate postdeprivation state law remedies coupled with random and unauthorized acts, has not been and need not be jettisoned. Further, *Sandin* speaks to the problems that have arisen in prisoner cases since *Wolff v. McDonnell*, 418 U.S. 539 (1974). The entire thrust of *Sandin* is retrenchment, not expansion. *Sandin*, 115 S. Ct. at 2300. That violations of most prison rules may no longer be the basis of § 1983 prisoner suits does not necessarily imply a dramatic change in nonprisoner § 1983 jurisprudence.

In the instant case, § 48.357(1), STATS., requires that when a change in placement of a child is requested by the person or agency primarily responsible for implementing the dispositional order, before that change takes place, the person or agency *shall* provide written notice to the child or the child's counsel or guardian ad litem, parent, foster parent, guardian and legal custodian explaining why the change is necessary. Any party receiving the notice may object and obtain a court hearing on the matter. *Id.* Section 48.357(1) thus limits the action of social workers regarding how a change in placement may be implemented. Chorlton's failure to abide by it was therefore unauthorized.

An act of a state employee is random only if it was impossible for the state to predict the action. Here, while the legislature enacted § 48.357(1), STATS., set-

ting forth the procedures with which Chorlton should have complied before changing Robby's placement, it was impossible for the state to anticipate that Chorlton would nonetheless disregard them notwithstanding his practice of ignoring this statute. *See Parratt v. Taylor*, 451 U.S. 527, 541 (1981) (concluding that it is impossible for the state to anticipate an employee's negligent act), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 330-31 (1986). Chorlton's failure to comply with § 48.357(1) is therefore a random act.

In *Easter House v. Felder*, 910 F.2d 1387, 1404 (7th Cir. 1990), *cert. denied*, 498 U.S. 1067 (1991), the court said:

> Section 1983 must be preserved to remedy only those deprivations which actually occur without adequate due process of law, such as those which result from a *state's* conscious decision to ignore the protections guaranteed by the Constitution. It should not be employed to remedy deprivations which occur at the hands of a state employee who is acting in direct contravention of the state's established policies and procedures which have been designed to guarantee the very protections which the *employee* now has chosen to ignore.

■

Yet, in analyzing a procedural due process claim, we must also determine whether the state's postdeprivation remedies are adequate.[8] The adequacy

---

[8] Indeed, Jones and Kinney do not argue that the state failed to provide adequate postdeprivation remedies. Instead, they argue that the existence of adequate postdeprivation remedies does not provide a defense to the procedural due process claim because meaningful predeprivation procedural protections existed. Jones and Kinney point to *Vorwald v. School District*, 160 Wis. 2d 536, 466 N.W.2d 683 (Ct. App. 1991), *rev'd*

of postdeprivation remedies is measured by the nature of the unauthorized deprivation. *Irby*, 184 Wis. 2d at 848, 522 N.W.2d at 16. Postdeprivation remedies are deemed adequate "unless they can 'readily be characterized as inadequate to the point that [they are] meaningless or nonexistent . . . .' " *Id.* at 847, 522 N.W.2d at 15-16 (quoted sources omitted).

Jones's and Kinney's interests in not being physically injured are obviously significant. However, state tort law provides the opportunity for a person who is harmed by another to recover damages to make that person whole. The fact that Jones and Kinney's negligence claim was unsuccessful does not persuade us that the adequacy of the tort remedy is diminished in any way. Due process guarantees the right to a hearing, not to a certain result. Accordingly, we conclude that these postdeprivation state law remedies are ade-

*on other grounds*, 167 Wis. 2d 549, 482 N.W.2d 93, *cert. denied*, 113 S. Ct. 378 (1992), in support of their argument. In *Vorwald*, we determined that the plaintiff could maintain a § 1983 procedural due process claim because the state could provide notice and a meaningful opportunity to respond prior to the alleged deprivation. *Id.* at 542, 466 N.W.2d at 686. However, after *Vorwald*, the Wisconsin Supreme Court decided *Irby v. Macht*, 184 Wis. 2d 831, 843-47, 522 N.W.2d 9, 13-15, *cert. denied*, 115 S. Ct. 590 (1994), in which it determined that notwithstanding the existence of predeprivation process, the existence of postdeprivation process defeated the constitutional claim when a state employee's actions were random and unauthorized. We are bound by the most recent pronouncements of the Wisconsin Supreme Court. *State v. Olsen*, 99 Wis. 2d 572, 583, 299 N.W.2d 632, 638 (Ct. App. 1980). Thus, we rely upon *Irby* for our analysis of this issue.

quate and their availability defeats the procedural due process claim.[9]

## 2. Substantive Due Process

Jones and Kinney also argue that they were deprived of their right to substantive due process as a result of Chorlton's failure to comply with § 48.357(1), STATS., and his forcing Robby back into their home where he posed a danger to them. Substantive due process bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them. *Zinermon*, 494 U.S. at 125. Unlike a procedural due process claim, the constitutional violation is complete when the deprivation occurs. *Id.* Consequently, the existence of adequate postdeprivation state law remedies is not a defense to a substantive due process claim.

The due process clause does not expressly guarantee the right to safety when a private actor commits the underlying act of which the plaintiff complains. *DeShaney*, 489 U.S. at 195.

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids

---

[9] Additionally, because we conclude that no procedural due process violation occurred, the issue of damages, albeit nominal, is irrelevant. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978) (denial of procedural due process should be actionable for nominal damages without proof of actual injury).

919

the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*Id.*

Thus, the due process clause generally confers no affirmative right to governmental aid even where such aid may be necessary to secure life, liberty or property rights of which the government itself may not deprive the individual. *Id.* at 196.

If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.

*Id.* at 196-97 (footnote omitted).

However, "the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198. Those special relationships arise when the state takes a person into custody and holds the person against his or her will. *Id.* at 199-200. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed

on his freedom to act on his own behalf." *Id.* at 200. Thus:

> it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionaliza-tion, or other similar restraint of personal liberty—which is the "deprivation of liberty" trig-gering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* (footnote omitted). In other words, for substantive due process purposes, the state only has a special rela-tionship with persons in custody and not with persons who might benefit from the existence of a statutory scheme which, if complied with, might have averted the harm caused by a private actor.[10]

Jones and Kinney argue that Chorlton knew of Robby's violent behavior and knew of his hatred for Jones. From this, they contend, a special relationship

---

[10] Jones and Kinney urge us to adopt the results in *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990), *Freeman v. Fergu-son*, 911 F.2d 52 (8th Cir. 1990), *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), *cert. denied*, 498 U.S. 938 (1990), and *Estate of Sinthasomphone*, 785 F. Supp. 1343 (E.D. Wis. 1992), in which the courts determined that the state had an affirmative duty to protect persons injured by private actors in noncustodial settings. We decline to do so. Federal decisions are not binding on state courts in Wisconsin. *Thompson v. Village of Hales Cor-ners*, 115 Wis. 2d 289, 307, 340 N.W.2d 704, 712-13 (1983). We are bound only by the United States Supreme Court on ques-tions of federal law. *State v. Webster*, 114 Wis. 2d 418, 426 n.4, 338 N.W.2d 474, 478 (1983). Thus, we confine our analysis to *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189 (1989).

arose between themselves and the state because: (1) the trial court ordered Robby to be placed under county supervision outside of his home and this order was in effect when the shooting took place; (2) Chorlton placed Robby in their home without first complying with § 48.357(1), STATS., despite his violent tendencies towards Jones; and (3) they relied upon Chorlton for information about the legal process and that he abused that trust and deprived them of their only means of protecting themselves. We recognize that when Robby was returned to his home, the order entered by the trial court requiring him to be placed outside of his home and into the care and custody of the county was still in effect. However, the fact remains that Robby's freedom was no longer restrained when he was placed in Jones's home. Thus, for substantive due process purposes, no special relationship existed between Robby and the state, thereby relieving the state of any duty to protect him. Additionally, we conclude that no special relationship ever existed between the state on the one hand and Jones and Kinney on the other hand. Their freedom was never restrained, they were never held against their will and therefore no duty to protect them from Robby's violent behavior ever arose.

The Supreme Court seemed to be speaking of the instant case when it concluded *DeShaney* with the following:

> The people of Wisconsin may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations such as the present one. They may create such a system, if they do not have it already, by changing the tort law of the State in accordance with the regular lawmaking process. But they should not have it thrust upon them by this Court's

expansion of the Due Process Clause of the Four-teenth Amendment.

*Id.* at 203. Accordingly, we conclude that there was no substantive due process violation.

## NEGLIGENCE CLAIM

Jones and Kinney also ask us to reverse the judgment entered by the trial court after the jury found that Chorlton was not liable for Jones's and Kinney's injuries based upon a theory of negligence. The jury found that while Chorlton was negligent, his negligence was not a cause of their injuries. Jones and Kinney argue that numerous prejudicial errors warrant a new trial. We address each claim in turn.

### 1. *Jury Instructions*

The trial court gave the standard causation and burden of proof instructions. In so doing, it rejected instructions offered by Jones and Kinney. During deliberations, the jury asked the court: (1) "Does 'a cause' refer to neglectful action being a direct contributing factor in building the situation the outcome of which was the injury?" and (2) "Or does 'a cause' refer to neglectful inaction which may have prevented the construction of any hypothetical situation in which (similar) injury may have occurred?" The court directed the jury to reread the jury instructions. Jones and Kinney argue that the questions evidence the jury's confusion as to causation and assert that the court's response to those questions "suggested to the jury that it had incorrectly read the given instruction and formulated impermissible conceptions of causation." They also note that two jurors dissented on the causation question as to Chorlton. Jones and Kinney conclude

that the causation instruction was misleading and prejudicial and warrants a new trial.

We review a trial court's conclusions as to what jury instructions are appropriate for an erroneous exercise of discretion. *Fischer v. Ganju*, 168 Wis. 2d 834, 849, 485 N.W.2d 10, 16 (1992). The supreme court has stated:

> The trial court has broad discretion when instructing a jury. A challenge to an allegedly erroneous jury instruction warrants reversal and a new trial only if the error was prejudicial. An error is prejudicial if it *probably* and not merely possibly misled the jury. If the overall meaning communicated by the instructions was a correct statement of the law, no grounds for reversal exist.

*Id.* at 849-50, 485 N.W.2d at 16 (citations omitted; emphasis added). The decision to accept or reject jury instructions also rests within the sound discretion of the trial court. *Strait v. Crary*, 173 Wis. 2d 377, 382, 496 N.W.2d 634, 636 (Ct. App. 1992).

Causation exists where a defendant's negligence is a substantial factor in producing the plaintiff's harm. *Fischer*, 168 Wis. 2d at 857, 485 N.W.2d at 19. "Substantial factor 'denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense.' " *Id.* (quoting *Clark v. Leisure Vehicles, Inc.*, 96 Wis. 2d 607, 617-18, 292 N.W.2d 630, 635 (1980)).

The trial court instructed the jury as to the following:

The cause questions ask whether there was a causal connection between the negligence of any person and the injuries. These questions do not ask about "the cause" but, rather, "a cause." The reason for this is that there may be more than one cause of an injury. The negligence of one person may cause an injury, or the combined negligence of two or more persons may cause it. Before you find that any person's negligence was a cause of the injury, you must find that his negligence was a substantial factor in producing the injury.

This standard causation instruction could not be a more accurate statement of the law. It permitted a finding that Chorlton caused Jones's and Kinney's injuries if the jury believed that his negligence was a substantial factor in producing the injuries. That the jury asked the trial court questions about this issue does not mean that the jury could not find causation under the instruction given in this case. The court's reply to the jury that it reread the causation instruction was also proper because the causation instruction directed the jury to focus on determining whether Chorlton's negligence was a substantial factor in producing the injuries. The instruction did not suggest to the jury that Jones and Kinney would have to establish what would have happened had Chorlton not made the change in placement. Further, the court's reply in no way commented on the correctness of the jury's interpretation of the issue and most certainly did not suggest that the jury not find causation. That two jurors dissented from the verdict is not evidence of confusion. It demonstrates only that the jury differed to some degree as to the weight and credibility of the evidence before it.

Jones and Kinney also proposed a modified burden of proof instruction as a substitute for the standard instruction which the trial court rejected. They argue that the standard instruction which requires "reasonable certainty" and uses the word "guess" confused the jury into believing that Jones and Kinney had to prove that the outcome, *i.e.*, Robby's violence, was predictable. They also argue that the jury confused "reasonable certainty" with "beyond a reasonable doubt," the latter being a higher burden of proof. We disagree.

The trial court instructed the jury that:

> The burden of proof . . . rests upon the party contending that the answer to a question should be "yes." This burden is to satisfy you to a reasonable certainty by the greater weight of the credible evidence that "yes" should be the answer.
>
> By the greater weight of the evidence is meant evidence which when weighed against evidence opposed to it has more convincing power. Credible evidence is evidence which in the light of reason and common sense is worthy of your belief.
>
> If you have to guess what the answer should be after discussing all evidence which relates to a particular question, then the party having the burden of proof as to that question has not met the required burden.

■■■

The ordinary or lowest burden of proof requires that the jury must be satisfied of the result to a reasonable certainty by the greater weight of the credible evidence. *Kruse v. Horlamus Indus., Inc.*, 130 Wis. 2d 357, 362-63, 387 N.W.2d 64, 66 (1986). While the plaintiff has the burden to satisfy the jury to a reasonable certainty, the plaintiff is not required to remove all

uncertainty. *Savina v. Wisconsin Gas Co.*, 36 Wis. 2d 694, 703, 154 N.W.2d 237, 241 (1967).

> [C]ertitude must be reasonable, *i.e.*, based on reasons. Defined in terms of quantity of proof, reasonable certitude or reasonable certainty in ordinary civil cases may be attained by or be based on a mere or fair preponderance of the evidence. Such certainty need not necessarily exclude the probability that the contrary conclusion may be true. . . . Such evidence . . . need not eliminate a reasonable doubt that the alternative or opposite conclusion may be true.

*Kuehn v. Kuehn*, 11 Wis. 2d 15, 26, 104 N.W.2d 138, 145 (1960).

The question of predictability is often an issue in an analysis of causation. That does not mean, however, that a different burden of proof instruction using some other language is more appropriate. Jones and Kinney present no evidence, save an adverse jury verdict, that the burden of proof instruction misled or confused the jury into wrongly concluding that it had to find that the outcome was predictable or that it must erase all doubt. The verdict shows only that the jury decided that it was not reasonably certain by the greater weight of the credible evidence that Chorlton's negligence was a cause of Jones's and Kinney's damages. Their argument, without more, is conjecture and does not persuade us that the jury did not understand the standard instruction.

The dissent concludes that not only was the causation instruction misleading, but that based upon the dissent's review of the evidence, we must find causation as a matter of law. The jury responded "yes" to the

following question: "At or before the shooting of September 7, 1982, was defendant James Chorlton negligent in the placement or supervision of Leland [Robby] Jones, Jr.?" The dissent, ignoring the breadth of this question, finds that Chorlton's negligent acts were his "return of Robby to his home without informing [Jones and Kinney] that he was still using drugs and that his behavior was potentially violent and dangerous" and "in forcing the Joneses to accept Robby back into their home even though he knew or should have known that Robby was dangerous to society and to the members of his family, especially his stepmother." Dissent at 967–68. The dissent then concludes, as a matter of law, that Chorlton's negligence was a cause of Jones's and Kinney's injuries.

First, Jones and Kinney have only asked us to determine whether the causation instruction was misleading and prejudicial and not whether there is credible evidence to sustain it. The issue of evidence sufficiency is not before us. Jones and Kinney request a new trial only because of a misleading instruction. The supreme court has recently discouraged the practice of addressing claims not specifically raised by the parties and developing the arguments for one side of a dispute. *Swatek v. County of Dane*, 192 Wis. 2d 47, 52 n.1, 531 N.W.2d 45, 47 (1995).

Second, the dissent reviews the evidence *de novo*, forgetting the standard by which we are to review a jury verdict.

> We will sustain a jury verdict if there is any credible evidence in the record to support it. If more than one reasonable inference can be drawn from the evidence, we must accept the reasonable inference the jury drew. We search the record for

928

> evidence to sustain the jury verdict, not for evidence that might sustain a verdict the jury might have but did not reach.

*Beacon Bowl, Inc. v. Wisconsin Elec. Power Co.*, 176 Wis. 2d 740, 791, 501 N.W.2d 788, 808 (1993) (citations omitted). The credibility of witnesses and the weight given to their testimony are matters left to the jury's judgment, not ours. *Bennett v. Larsen Co.*, 118 Wis. 2d 681, 706, 348 N.W.2d 540, 554 (1984). Where more than one inference can be drawn from the evidence, we must accept the inference drawn by the jury. *Id.*

Our review of the trial transcript reveals that while Chorlton admitted that he did not comply with § 48.357(1), STATS., he placed Robby in Jones's home after reviewing the facts and circumstances of Robby's case as reported to him. Yet, Robby testified that he decided to shoot Jones no more than three minutes before he did, that there was no way Chorlton could have expected that he would shoot her, that the shooting had nothing to do with Chorlton, and that he did not blame Chorlton or Jones for the shooting and instead, he mostly blamed himself because he loaded the gun and he pulled the trigger. Robby also testified that even if he had not shot Jones and Kinney on the day that he did, he might have done so on a different day. Further, several experts testified that Robby's violence could not have been predicted. There was also testimony revealing that Robby was very adept at manipulation. From this evidence, a reasonable jury could have concluded that Chorlton's negligence was not a substantial factor in causing Jones's and Kinney's injuries. It also could have concluded that had Chorlton complied with § 48.357(1), the juvenile court might still have placed Robby with his parents, with the same

929

tragic result. The competing inferences here prohibit a finding of causation as a matter of law. The jury verdict is supported by credible evidence and therefore must be sustained.

## 2. Dismissal of Gerald McCartney

At the close of Jones and Kinney's case-in-chief, Gerald McCartney, director of the Department of Social Services for Dane County, moved for dismissal of the negligence action against him on the grounds of insufficient evidence. Section 805.14(3), STATS.[11] The trial court dismissed the case against McCartney because under a theory of *respondeat superior*, Dane County, not McCartney, was Chorlton's employer who would be liable for damages, and because Jones and Kinney's experts did not testify as to any applicable standard of care. The court also noted the department's bureaucracy and McCartney's position at the head of it. The court stated that it believed that expert testimony was required as to McCartney's standard of care as a supervisor which it considered to be greater than that of a social worker.

Jones and Kinney argue that dismissal of their action against McCartney was error. They contend that McCartney admitted that he was responsible for assuring that Chorlton followed statutory procedures and court orders and that the jury could decide his negli-

---

[11] Section 805.14(3), STATS., provides:

At the close of plaintiff's evidence in trials to the jury, any defendant may move for dismissal on the ground of insufficiency of evidence. If the court determines that the defendant is entitled to dismissal, the court shall state with particularity on the record or in its order of dismissal the grounds upon which the dismissal was granted and shall render judgment against the plaintiff.

gence based upon those admissions and his and Chorlton's testimony. We disagree.

Section 805.14(1), STATS., sets forth the test for determining the sufficiency of the evidence:

> No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

On review, we must examine the evidence in the light most favorable to Jones and Kinney, but we will not reverse the trial court's dismissal unless the findings upon which it is based are clearly erroneous. Section 805.17(2), STATS.

McCartney testified that in 1982, he never reviewed Chorlton's case load or knew about this case because Chorlton was one of about 300 staff members who were divided up into divisions and subdivisions or units. McCartney explained that each unit had a supervisor responsible for reviewing, assigning and evaluating the work of each staff member. The unit supervisors, in turn, reported to a program manager who was responsible for evaluating the unit supervisors. McCartney explained that his responsibilities as an administrator did not involve conducting a personnel review of Chorlton and that he would only become involved in a case when a matter was brought to his attention. Instead, it was Chorlton's immediate supervisor who monitored Chorlton's activities and made judgments about his performance.

██

While McCartney admitted that he was responsible for assuring that his staff complied with statutory procedures, Jones and Kinney presented no evidence that McCartney failed to discharge this duty in some fashion. That Chorlton did not comply with the statute does not mean that McCartney did not direct his staff to do so. McCartney explained his duties and that he did not become involved with individual cases unless they were called to his attention. None of Jones or Kinney's witnesses testified that he was required to do anything more. Jones and Kinney argue that McCartney's standard of care is that of an ordinary prudent person and that the jury should have been permitted to decide if his failure to ensure that Chorlton complied with the statutory procedures and his failure to know about the practice of changing placement without first giving notice pursuant to § 48.357(1), STATS., were breaches of that duty. However, no one testified that McCartney's failure to ensure social worker compliance was improper. Additionally, no one testified that his ignorance as to the social workers' practice of changing placement before giving notice was improper. Accordingly, we conclude that the dismissal of the case against McCartney was not error.

*3. Restriction of Cross-Examination of Gerald McCartney*

Jones and Kinney argue that the trial court erroneously exercised its discretion when it prevented them from introducing McCartney's 1988 and 1989 job performance evaluations. They also sought to introduce evidence that McCartney had become involved in another lawsuit with Dane County after September 1982. According to Jones and Kinney, this evidence

relates to McCartney's credibility and his performance as a supervisor.

The decision to admit evidence rests within the sound discretion of the trial court and will not be reversed unless such discretion is erroneously exercised or is premised upon an erroneous view of the law. *Christensen v. Economy Fire & Casualty Co.*, 77 Wis. 2d 50, 55, 252 N.W.2d 81, 84 (1977). Section 904.01, STATS., defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Section 904.03, STATS. The proper standard for the test of relevancy on cross-examination is not whether the answer sought will elucidate any of the main issues in the case but whether it will be useful to the trier of fact in appraising the credibility of the witness and evaluating the probative value of the direct testimony. *Rogers v. State*, 93 Wis. 2d 682, 689, 287 N.W.2d 774, 777 (1980). "[A]ny material or relevant matters may be inquired into on cross-examination and that cross-examination is not limited to the scope of direct examination." *Id.* The scope of cross-examination for impeachment purposes rests within the sound discretion of the trial court. *Id.*

The trial court refused to admit the 1988 and 1989 evaluations and proof of the other lawsuit concluding that such evidence was not relevant because it was too remote from the date of the shooting incident which occurred in September 1982. It also concluded that evi-

dence pertaining to the lawsuit was prejudicial and would unduly confuse the jury. We agree that any bearing this evidence might have had upon McCartney's credibility or performance as a supervisor in 1982 was so remote that it was not an erroneous exercise of discretion for the trial court to exclude it. What McCartney might have done in 1988 and 1989 in no way related to the truthfulness of his testimony or his performance as a supervisor in 1982. Additionally, evidence of another lawsuit would have been highly prejudicial and also in no way impacted upon his truthfulness or his performance as a supervisor in 1982. Accordingly, the trial court did not erroneously exercise its discretion when it refused to admit this evidence.

### 4. Admissibility of James Chorlton's Job Performance Evaluations

Jones and Kinney argue that the trial court erroneously exercised its discretion when it admitted Chorlton's favorable job performance evaluations completed by another employee for the period between 1977 and 1982. Jones and Kinney argue that this decision is inconsistent with the trial court's decision to exclude McCartney's unfavorable job performance evaluations and is therefore prejudicial error.

Admission of evidence is not "each side gets one." It rests within the discretion of the trial court. *Pophal v. Siverhus*, 168 Wis. 2d 533, 546, 484 N.W.2d 555, 559 (Ct. App. 1992). If the trial court examined the relevant facts, applied a proper standard of law, and used a rational process to reach a rational result, we will affirm. *Id.*, 484 N.W.2d at 560. Only if the court relied

934

on an erroneous understanding of an evidentiary rule will we reverse. *Id.*

The reason for the seemingly inconsistent rulings is this: the trial court admitted Chorlton's job performance evaluations covering 1977 through 1982 because they were extremely relevant to the issue of whether Chorlton was negligent in 1982, while conversely, McCartney's job performance evaluations covering 1988 through 1989 were irrelevant because they did not pertain to the time period at issue, *i.e.*, 1982. The court ruled that McCartney's evaluations were irrelevant and inadmissible because of their remoteness. Thus, the court did not erroneously exercise its discretion when it admitted Chorlton's job performance evaluations because they were not remote and relevant to the case.

## 5. *Dr. Larry Zuberbier's Expert Testimony*

Jones and Kinney argue that the trial court erred when it reversed an earlier ruling and permitted Chorlton's expert witness, Dr. Larry Zuberbier, to testify. Dr. Zuberbier was not available for deposition until just before trial. They contend that his testimony was prejudicial because they did not have adequate time to prepare for rebuttal.

The trial court had initially ordered that Dr. Zuberbier not be permitted to testify apparently because he was not named as a witness by Chorlton until almost two years after the court ordered Chorlton to provide his expert witnesses' names. In making this ruling, the court warned Jones and Kinney not to mention Dr. Zuberbier during their case-in-chief. During trial, the court reversed its ruling after Jones and Kinney made numerous references to Dr. Zuberbier and

his evaluation of Robby during opening statements and during their case-in-chief. The court reasoned that Jones and Kinney had opened the door to the issue of the importance of Dr. Zuberbier's evaluation of Robby and that it would be inappropriate to preclude Chorlton from calling Dr. Zuberbier to discuss it himself.

The admission of evidence rests within the discretion of the trial court. *Pophal*, 168 Wis. 2d at 546, 484 N.W.2d at 559. Notwithstanding a prior trial court order prohibiting this line of questioning, a court may properly allow limited follow up questions when the other party opens the door to a particular line of inquiry. *See State v. Mares*, 149 Wis. 2d 519, 531, 439 N.W.2d 146, 150 (Ct. App. 1989) (prosecutor permitted to ask limited follow-up questions on issues brought out by the defense during its cross-examination of a witness).

The trial court did not erroneously exercise its discretion by permitting Dr. Zuberbier to testify once Jones and Kinney made repeated references to his evaluation. Chorlton was entitled to have Dr. Zuberbier testify regarding his evaluation and the import of the statements contained therein. Additionally, the fact that much of Dr. Zuberbier's testimony centered on a discussion of the predictability of Robby's violence which related directly to the causation issue does not make this testimony improper. Indeed, Jones and Kinney's own expert, Dr. Peter Pecora, admitted on cross-examination that problems exist with predicting violent behavior and that Chorlton could not have predicted that Robby would have shot Jones and Kinney after being placed in their home. Chorlton's other

expert witness, Dr. Sue Seitz, also testified that violent behavior is not predictable. Thus, Dr. Zuberbier's testimony was cumulative and not prejudicial. Once Jones and Kinney raised the issue of Dr. Zuberbier's evaluation, Chorlton was entitled to introduce Dr. Zuberbier's testimony explaining his evaluation of Robby.

## 6. *Learned Treatises*

Jones and Kinney argue that the trial court erred when it admitted into evidence a chapter of a book entitled, *The Psychologist's Legal Handbook*, addressing the predictability of violent behavior. According to Jones and Kinney, Chorlton failed to establish the proper foundation for the admission of this book into evidence and failed to give adequate notice that he intended to admit it into evidence. Jones and Kinney argue that Dr. Zuberbier relied upon that chapter of the book for some of his conclusions regarding the predictability of Robby's violence and therefore, its admission into evidence unfairly prejudiced Jones and Kinney.

While § 908.03(18)(a), STATS., provides forty days' written notice before a learned treatise may be received into evidence except for impeachment on cross-examination, a trial court may, under § 908.03(18)(c), relieve a party from this requirement. We do not address whether it was error for the court to admit this portion of the book into evidence because its admission did not prejudice Jones and Kinney. The book was only partially relied upon by Dr. Zuberbier for his opinions. Additionally, while admitted into evidence, it was not given to the jury. Further, the evidence was cumulative because it pertained to a subject, *i.e.*, the predictability of violent behavior, which witnesses for both sides tes-

tified to in detail. Accordingly, Jones and Kinney were not prejudiced by any error that might have occurred by its admission into evidence.

### 7. Expert Testimony on Parental Negligence

Jones and Kinney argue that the trial court erroneously exercised its discretion in permitting Chorlton's expert, Dr. Sue Seitz, to testify as to parental negligence and specifically, as to Jones's performance as a parent. They contend that § 907.02, STATS., only permits expert testimony on matters requiring special knowledge, skill or experience on subjects which are not within the realm of the ordinary experience of mankind. *Kujawski v. Arbor View Health Care Ctr.*, 139 Wis. 2d 455, 463, 407 N.W.2d 249, 252 (1987).

The jury found that Jones was negligent but that her negligence was not a cause of her and Kinney's damages. The jury also found that Chorlton was negligent but that his negligence was not a cause of Jones's and Kinney's damages. Whether or not the trial court erred in admitting this evidence, it did not prejudice Jones and Kinney. This evidence was only relevant to the issue of Jones's duty of care and whether she breached that duty. Jones and Kinney do not argue that this evidence was related to Chorlton's liability in that it somehow diminished the likelihood of the jury finding that Chorlton caused her and Kinney's damages. Thus, that the jury might have become misled or confused as to Jones's duty of care is irrelevant when the jury did not find her negligence to be a cause of their damages. Thus, Jones and Kinney were not prejudiced by this testimony. Accordingly, we conclude that a new trial is not warranted.

## 8. Absent Witness Instruction

Jones and Kinney argue that the trial court erroneously exercised its discretion when it denied their request for an absent witness instruction and prevented them from commenting on Chorlton's failure to testify during his case-in-chief. According to Jones and Kinney, Chorlton played a central role in the case and they should have been permitted to comment on his failure to testify on his own behalf and the inferences that might have been drawn from that failure to testify.

 The absent witness instruction provides:

> If a party fails to call a material witness within its control, or whom it would be more natural for that party to call than the opposing party, and the party fails to give a satisfactory explanation for not calling the witness, then you may infer that the evidence which the witness would give would be unfavorable to the party who failed to call the witness.

WIS J I—CIVIL 410. The decision to give the absent witness instruction rests within the sound discretion of the trial court. *Roeske v. Diefenbach*, 75 Wis. 2d 253, 262, 249 N.W.2d 555, 560 (1977). In order to justify the instruction, the party requesting the instruction "must show that there is a reasonable relationship between the failure to produce the witness and the inference that the testimony of the absent witness, had it been placed before the jury, would have been unfavorable to the party who failed to produce the witness." *D.L. v. Huebner*, 110 Wis. 2d 581, 627, 329 N.W.2d 890, 911 1983).

Contrary to Jones and Kinney's assertions, Chorlton's testimony was not completely kept from the jury. Instead, he was called as an adverse witness by them and they extensively questioned him about his conduct and decision-making processes. The trial court properly denied the request for the absent witness instruction reasoning that the instruction was inappropriate because Chorlton had been called as an adverse witness and that Jones and Kinney had ample opportunity to examine him.

Jones and Kinney have also failed to demonstrate that a reasonable relationship exists between the failure of Chorlton to testify during his case-in-chief and the inference that had he done so, his testimony would have been unfavorable. We do not see how any further testimony by Chorlton would have shed any more light on the causation issue. The jury found that Chorlton was negligent but that his negligence was not causal. Expert testimony, not Chorlton's, decided the causation issue. The only unfavorable inference the jury could have drawn would have been that Chorlton was more negligent than it had already concluded. Thus, had the jury been permitted to infer that Chorlton's failure to testify would be unfavorable to Chorlton, the outcome would have been the same. The trial court's failure to permit an absent witness instruction or its failure to permit further argument on the issue during closing arguments[12] did not prejudice Jones and Kinney. We conclude that the court did not erroneously

[12] Contrary to Jones and Kinney's assertions, they did comment during closing arguments on Chorlton's failure to testify during his case-in-chief and speculated that they did not know why he failed to do so. Upon Chorlton's objection, the trial court instructed the jury to disregard that portion of the closing argu-

exercise its discretion when it declined their request for the absent witness instruction.

## NEW TRIAL IN THE INTEREST OF JUSTICE

Finally, Jones and Kinney request a new trial in the interest of justice. We are given the authority to grant such a request by § 752.35, STATS. We may grant a new trial if the real controversy has not been fully tried or if we conclude that a new trial will likely produce a different result. *State v. Von Loh*, 157 Wis. 2d 91, 102, 458 N.W.2d 556, 560 (Ct. App. 1990). Our foregoing discussion shows that Jones and Kinney have not demonstrated that the real controversy was not tried or that a new trial would be likely to produce a different result. Consequently, we reject their request for a new trial.

*By the Court.*—Judgment and order affirmed; cross-appeal dismissed.

EICH, C.J. (*concurring*). I write separately (and briefly) not to set forth or argue a position. The dissenting judge's lengthy opinion advocating his view of this case, and to an equal degree his disagreement with both the reasoning and the relevance of the United States Supreme Court's decision in *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189 (1989), is argument enough for one day.

The majority opinion in this case and the Supreme Court's opinion in *DeShaney* adequately explain the reasons underlying the decisions reached in each instance. Those reasons need not be restated (or re-

___

ment which referred to the obligation of the defense to call Chorlton.

evaluated) here. I note only that *DeShaney* is the opinion of a majority of the nation's highest court on an issue crucial to this case and that, as an intermediate state appellate court, we are bound by decisions of the United States Supreme Court on questions of federal constitutional law—even though we (and several law-review writers) may disagree. *See State v. Mechtel*, 176 Wis. 2d 87, 94-95, 499 N.W.2d 662, 666 (1993); *State v. Webster*, 114 Wis. 2d 418, 426 n.4, 338 N.W.2d 474, 478 (1983).

The dissent criticizes the majority's reasoning, and its analysis of *DeShaney* and other cases, as "fallacious." Dissent at 961. I note only that, while I do not agree with the dissenting judge's arguments, I do not consider those arguments "fallacious." They are extensively researched and eloquently stated; but they are also, as are most legal positions, ones with which reasonable persons may disagree. Indeed, as the dissenting judge acknowledges, both he and the lawyers who argued their positions to us "struggled . . . with the legal [and] procedural issues" in the case. Dissent at 953 n.7.

We all did. Resolution of complex legal and constitutional issues is often a "struggle." It is not a task admitting of black-and-white certainties but one in which differing and often competing legal positions and analyses must be considered, interpreted, evaluated and, where possible, harmonized. And where harmony eludes us—as it often does in such cases (witness the dissents in this case, in *DeShaney* and in most of the other cases discussed in today's opinions)—it is rare that one side will have a monopoly on either truth or justice, or, rarer still, on both.

I join the majority opinion in this case because I am persuaded by its interpretation of the applicable

law and the manner in which it addresses the arguments advanced by the parties. That is not to say that reasonable people—including other judges—will not disagree. But I doubt that any of us, whether in the majority or the minority, has the unquestionably "right" answer to the complex and often unsettling questions raised on this appeal.

SUNDBY, J. (*dissenting*). Joshua DeShaney was just two weeks short of his fourth birthday when his father beat him so severely that he fell into a life-threatening coma. *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 193 (1989). The doctors who performed emergency brain surgery on Joshua founds pools of rotted blood in his brain resulting from his father's repeated beatings.[1]

Joshua and his mother (hereafter "Joshua") began an action under 42 U.S.C. § 1983[2] against the Winnebago County Department of Social Services, several caseworkers and other officials for depriving them of their liberty interest in their personal safety under the due process clause of the Fourteenth Amendment to the United States Constitution. The due process clause provides in part: "No State . . . shall . . . deprive any

---

[1] Martha Minow, *Words and the Door to the Land of Change: Law, Language, and Family Violence*, 43 VAND. L. REV. 1665, 1666 (1990). Joshua survived but is now a patient in an institution for profoundly retarded persons. *Id.*

[2] Title 42 U.S.C. § 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV, § 1. The Seventh Circuit Court of Appeals affirmed the federal district court's decision dismissing Joshua's action. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 812 F.2d 298 (7th Cir. 1987), *aff'd*, 489 U.S. 189 (1989). The court concluded that the due process clause did not require the state to protect Joshua from the beatings inflicted on him by a private actor—his father. On *certiorari*, the Supreme Court affirmed the lower courts.

The trial court herein concluded that *DeShaney* required that it grant respondents' motion for summary judgment dismissing appellants' § 1983 action. I disagree. I conclude that appellants state claims under the procedural and substantive components of the due process clause. This case is distinguishable from *DeShaney* because the child and his family involved herein were subject to a juvenile court's dispositional order which removed the child from his home and placed him in the custody of the Dane County Department of Social Services for one year. Joshua DeShaney was not subject to a dispositional order and remained in his home.

The due process clause has two components: a procedural component and a substantive component. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). *DeShaney* involved only the substantive component. The case before us involves both. I conclude that because the state assumed the duty to care for Robby and his family, and its agents were recklessly indifferent to that duty, it deprived appellants of their liberty interest in their personal safety under the substantive component of the due process clause. I further conclude that because respondents forced Robby's father and stepmother to accept Robby back into their home without

notice and an opportunity to object as required by § 48.357(1), STATS., they deprived them of procedural due process.[3] In this case, respondents' deprivation of appellants' right to procedural due process contributed to and overlapped their deprivation of appellants' right to substantive due process.

## SUBSTANTIVE DUE PROCESS

Chief Justice Rehnquist, who authored the majority opinion in *DeShaney*, stated that the most that could be said as to the Winnebago County caseworkers was that they stood by and did nothing while Joshua's father beat him to the point of permanent insensibility. 489 U.S. at 203. Joshua was not in physical custody of the state nor was he subject to the department's formal supervision. The majority of the Court agreed that the state had no obligation under the due process clause to protect Joshua from his father's violence, even though the state's agents knew that Joshua's father was regularly battering him. The social worker who periodically visited Joshua's home expressed her belief that "the phone would ring some day and Joshua would be dead." *Id.* at 209 (Brennan, J., dissenting). In the instant case, the majority concludes that appellants' liberty interest in their personal safety was not protected by the due process clause because neither Robby nor his family was in physical custody of the state;[4] nor was Robby a

---

[3] This alleged "fact" is disputed by respondents, as are other facts appellants allege. At the motion-to-dismiss stage of summary judgment, we must accept these allegations as true. Further, respondents argue: "Even accepting all of the appellants factual allegations as true, no Sec. 1983 claim would exist under *DeShaney*."

[4] However, respondents concede that Robby was in "some sort of custody" of the state.

945

state actor when he shot and seriously wounded appellants.

While the physical custody requirement has the advantage of all bright-line rules, it has no support in *DeShaney* or decisions prior or subsequent to *DeShaney*. The overwhelming majority of the courts have held that when the state assumes a duty to protect a person who is not in the physical custody of the state, the due process clause requires that the state not be recklessly indifferent to that duty.

Not since *Roe v. Wade*, 410 U.S. 113 (1973), *modified by Planned Parenthood v. Casey*, 112 S. Ct. 2791 (1992), has a decision of the Supreme Court evoked such critical commentary from the interpretive community as has *DeShaney*.[5] Professor Aviam Soifer calls

---

[5] *See* Susan Bandes, *The Negative Constitution: A Critique*, 88 MICH. L. REV. 2271 (1990); Jack M. Beermann, *Administrative Failure and Local Democracy: The Politics of DeShaney*, 1990 DUKE L.J. 1078; Karen M. Blum, *Monnel, DeShaney, and Zinermon: Official Policy, Affirmative Duty, Established State Procedure and Local Government Liability Under Section 1983*, 24 CREIGHTON L. REV. 1 (1990); Caitlin E. Borgmann, *Battered Women's Substantive Due Process Claims: Can Orders of Protection Deflect DeShaney*, 65 N.Y.U.L. REV. 1280 (1990); Michael D. Daneker, *Moral Reasoning and the Quest for Legitimacy*, 43 AM. U. L. REV. 49 (1993); Arlene E. Fried, *The Foster Child's Avenues of Redress: Questions Left Unanswered*, 26 COLUM. J.L. & SOC. PROBS. 465 (1993); Martha Minow, *Words and the Door to the Land of Change: Law, Language, and Family Violence*, 43 VAND. L. REV. 1665, 1666-78 (1990); Jane Rutherford, *The Myth of Due Process*, 72 B.U. L. REV. 1, 60-62 (1992); Amy Sinden, *In Search of Affirmative Duties Toward Children under a Post-DeShaney Constitution*, 139 U. PA. L. REV. 227 (1990); Aviam Soifer, *Moral Ambition, Formalism, and the "Free World" of DeShaney*, 57 GEO. WASH. L. REV. 1513 (1989); David A. Straus, *Due Process, Government Inaction, and Private Wrongs*, 1989 SUP. CT. REV.

Chief Justice Rehnquist's opinion an "abomination." Soifer, *Moral Ambition, Formalism, and the "Free World" of DeShaney*, 57 GEO. WASH. L. REV. 1513, 1514 (1989). Professor Jack M. Beermann describes Rehnquist's "free society" distinction as "bizarre." Beermann, *Administrative Failure and Local Democracy: The Politics of DeShaney*, 1990 DUKE L.J. 1078, 1087.

Professor Soifer's allusion to the "free world" of Joshua DeShaney refers to Chief Justice Rehnquist's assertion that "[w]hile the State may have been aware of the dangers that Joshua faced in the *free world*, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *DeShaney*, 489 U.S. at 201 (emphasis added). In this case, respondents recklessly required Robby's father and stepmother to reassume their duty to care for Robby, without informing them that Robby continued to use drugs and was potentially violent. The caseworker's "reckless indifference" lies principally in his *ipse dixit* decision to compel Robby's father and stepmother to accept Robby back into their home without informing himself and appellants as to whether Robby was ready to return home. The worker's decision was not based on his assessment that Robby was ready for the "free world" but that the department had no placement available to treat Robby's needs. I conclude that lack of available placement does not excuse the

53; *Developments in the Law: Legal Responses to Domestic Violence*, 106 HARV. L. REV. 1498 (1993). For a summary of the history of child protection since the Seventeenth Century, see Laura Oren, *The State's Failure to Protect Children and Substantive Due Process: DeShaney in Context*, 68 N.C. L. REV. 659, 665-69 (1990).

department's failure to care for Robby according to his needs.

Soifer claims that Rehnquist severely diminished the extent of the involvement of the Winnebago County Department of Social Services and its workers in Joshua's situation. 57 GEO. WASH. L. REV. at 1518. Regardless, that involvement did not approach the almost total involvement of the Dane County Department of Social Services in Robby's life. It is the extent of that involvement which distinguishes the present case from *DeShaney*.

In *DeShaney*, Judge Posner framed the constitutional question presented to the Supreme Court as whether "a reckless failure by Wisconsin welfare authorities" to protect a child under the state's supervision might violate the due process clause. *DeShaney*, 812 F.2d at 299. Professor Soifer points out how easy it would have been for the *DeShaney* majority to reach the opposite result, and to do so on narrow grounds, in view of Judge Posner's description of the constitutional issue. 57 GEO. WASH. L. REV. at 1516 n.14. Professor Soifer argues that:

> [I]t . . . would have been very easy to decide this case on the narrow basis of its appalling facts, because the particular governmental inaction, despite repeated contact by state officials, surely rises to the level of "deliberate indifference," "recklessness," or "gross" negligence made actionable even under this Court's recent, stingy precedents.

*Id.* at 1527. In the case before us, it is not governmental inaction which rises to such levels; it is the affirmative action of the state's agents in coercing the Joneses to accept Robby back into their home, when the state's agents knew or should have known that he continued

to use illegal drugs and remained potentially danger- ous, especially to his stepmother at whom most of Robby's hatred was directed.[6]

Rehnquist refused to " 'thrust upon' the people of Wisconsin an unworthy expansion of the Due Process Clause." 57 GEO. WASH. L. REV. at 1529 (quoting *DeShaney*, 489 U.S. at 203). I do not believe that the people of Wisconsin would consider it an unworthy expansion of the due process clause to require their juvenile courts and social service departments to pro- tect children and families over whom they have assumed supervision.

Chief Justice Rehnquist adopts Judge Posner's view of the constitution as a charter of negative liber- ties. *See* 489 U.S. at 195. In *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982), Judge Posner wrote: "The Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." *See also Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir. 1983) (Judge Posner stated that "the Constitution is a charter of negative rather than posi- tive liberties. The men who wrote the Bill of Rights were not concerned that government might do too little for the people but that it might do too much to them." (citations omitted)), *cert. denied*, 465 U.S. 1049 (1984). Thus, the substantive component of the due process clause protects the individual from arbitrary and capri- cious action by the state and its agents but does not protect them from private violence. The constitution

---

[6] Pursuant to court order, Dr. Larry Zuberbier evaluated Robby. In his evaluation, he reported that Robby's hatred of his stepmother was so intense that he shook when he described how he could hurt her. The caseworker was aware of this report.

does not require the state to maintain police departments; that is a decision made by the people's representatives.

Rehnquist hints that the due process clause would have protected Joshua if the state had worsened Joshua's situation. *See* 489 U.S. at 201. In this case, the state worsened Robby's family's situation by coercing them to accept him back into their home before he was ready for the "free world," and assuring his father and his stepmother that Robby had made such progress that he was ready to be returned to their home. It is undisputed, however, that when the caseworker sought to return Robby to his home after his discharge from Thoreau House, his father and stepmother objected and the caseworker placed Robby at Bockari House, a temporary facility to which juveniles are assigned who are awaiting disposition. The stepmother deposed that the caseworker assured her that Robby would get help at Bockari House. The appellants allege that the caseworker knew that Bockari House was not a treatment facility.

It is also undisputed that the caseworker based his decision to return Robby to his home on his belief that "[d]uring August [1982], Robby maintained the highest level at Bockari due to good behavior, and he completed summer school, and attended AA meetings and visited with his parents." The caseworker later admitted that these facts were not true. In his reply brief however, the worker continues to rely on facts which he knows are not true: "Robby was at a high level of behavior at Bockari House and had consistently improved in both individual and family therapy throughout his stay in all of the various placements over the previous year." Respondents do not cite anywhere in the record where this "high level of behavior" is chronicled. In fact,

Robby had not improved; he was discharged from Wyeth House and Thoreau House for violating home rules. He continued to use illegal drugs while he was placed in such homes and thereafter. He engaged in abusive behavior directed at himself and others. The caseworker was not merely negligent in determining Robby's true situation; he was recklessly indifferent to Robby's condition.

The caseworker admitted that he did not question Bockari House staff as to Robby's progress. Had the caseworker reviewed staff progress notes he would have found that Robby's "progress" at Bockari House was consistent with his conduct at other group homes. The Family Counselor at Wyeth House stated in her Discharge Summary:

> In group, individual and family sessions, Rob presented himself as intelligent, pleasant, highly defensive and a first-rate con. He has the ability to quickly size up a counseling situation be it individual, group or family, and feed back appropriate verbal responses. His suppressed feelings of anger, hurt and shame did sometimes surface. At these times, Rob became violent and self-abusive. Old family hurts, centering on the divorce conflict between his natural parents, were major areas of confusion, frustration and rage for Rob.
>
> For the most part, Rob played his con game in group mouthing responses. He was almost always dishonest in family sessions. . . .

The staff notes covering Robby's stay at Bockari House reveal a "honeymoon" period and then disillusion. On August 3, 1982, Robby was placed by staff at level five, the highest level attainable at Bockari House. In her daily log, the staff worker reported on August 6, 1982: "As usual, Rob had a perfect day and

he's doing great." Gradually, the staff workers became aware of how adept Robby was at conning them. On August 20, 1982, staff placed him back at level two. He got into a fight with another resident at a bowling alley. The worker told him "one more fist and he'd be going to detention." "He looked at me [and] called me a 'f— bitch' and made a fist." The worker was ready to terminate Robby's placement but gave him the benefit of the doubt.

On August 25, 1982, two days before his scheduled return home, at some time between 7:00 p.m. and 8:30 p.m., Robby broke out the screen door and took off. The worker's notes show the following: "So far, Rob's actions the last few weeks show a great disturbance within him. All of the sudden mood changes [and] violence show *he's not yet ready to go home*, [and] may possibly need further counseling." (Emphasis added.)

Another worker reported that Robby had signed out to visit his girlfriend but did not do so. The worker commented:

> So much for honesty [and] credibility, which leads to several other questions. If Rob is being deceitful about his use of time, how long has it been going on? And is he also being deceitful about other things like his chemical use [and] taking things from others? I'm afraid the bottom is about to fall out.

The worker was prescient; the bottom did fall out. The worker questioned whether Robby was able to deal with an open setting. She suggested that possibly his deteriorating attitude and behavior were related to his pending placement at home. The worker commented: "It's obvious that Rob is not nearly as mature or stable as he initially impressed us as being."

The Jones family's caseworker did not confer with Bockari staff to determine whether Robby was ready to be returned home. The caseworker deposed that he expected that Bockari staff would inform him whether there were reasons why Robby should not be returned home.

*DeShaney* is a weak reed upon which to support summary judgment in this case because the facts as to respondents' care of Robby are seriously disputed and *DeShaney*'s predicate—lack of duty—is missing.

There is a wealth of authority as to the responsibilities of social workers and their liability under state law and § 1983.[7] *See Liability in Child Welfare and Protection Work: Risk Management Strategies*, ABA CENTER ON CHILDREN AND THE LAW (1991). Our research reveals that since January 1995, *DeShaney* has been cited in fifty-five decisions. These cases and authorities firmly establish that noncustodial relationships between the state and the claimant may trigger the due process clause when there is a "special" relationship between the state and the claimant or when the state

---

[7] Unfortunately, our research of that authority and the unusual posture of this case delayed our decision. Also, my research satisfied me that I could not accept the majority's view that the due process clause does not require the state to protect individuals who are not in the physical custody of the state. I struggled for sometime with the significance of the jury's verdict in the state-law claim on the trial court's grant of respondents' motion for summary judgment dismissing appellants' civil rights action. I would have required the parties to brief that question. Plainly, the parties have also struggled not only with the legal issues but the procedural issues. This case did not come to trial until eight years after the shooting. Undoubtedly, the appellants' severe injuries contributed to the delay.

places a person in danger which might not be faced in the "free world."

In several of these cases, the facts are so appalling that they graphically illustrate that the majority's bright-line "custody" rule is too superficial to be seriously considered as a standard. One of these cases is the *Dahmer* case, *Estate of Sinthasomphone v. City of Milwaukee*, 785 F. Supp. 1343 (E.D. Wis. 1992). The court concluded that at the motion-to-dismiss stage, it could not say that no special relationship existed between Dahmer's victim and the police. The court, therefore, denied respondents' motion to dismiss based on *DeShaney*. The court concluded that "the *DeShaney* doctrine is not without some small cracks in its surface; hairline, perhaps, but cracks nonetheless." 785 F. Supp. at 1348.

One of these cracks was caused by *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990). A twelve-year-old boy fell from a dock into Lake Michigan. Within minutes, two lifeguards, two fire fighters, one police officer and two civilians with scuba diving equipment responded to pleas for assistance. However, before any rescue attempt could begin, a Lake County deputy sheriff arrived in a marine patrol boat. He insisted that only the county, which had a contract with Waukegan, could provide rescue services on Lake Michigan. When the civilian scuba-divers offered to attempt to rescue the boy at their own risk, the deputy sheriff promised to arrest them if they entered the water. Twenty minutes later, authorized divers arrived and pulled the boy from the water. Of course, he died as a result of the incident. The court found that the complaint stated a claim under § 1983 against both Lake County and the individual deputy. While the sheriff's deputy had not taken the boy into custody, he had taken control of the

situation and by his directives had unconstitutionally subjected the boy to a special danger.

The decisions we have researched reveal an almost unanimous hostility to *DeShaney* where the facts show that the state has placed or allowed persons to be involuntarily placed in situations of special danger.

The American Bar Association Center on Children and the Law states that, "[w]hile *DeShaney* has served to limit the liability of caseworkers, of child protective and child welfare agencies, and of private service providers in some respects, it does not affect most of the cases filed in this context." *Liability in Child Welfare and Protection Work* at 18. The Center assesses the level of risk of liability where the state fails to adequately protect a child from harm in foster care as "high." *Id.* at 27. It rates failure to warn of the child's dangerousness as "moderate-high." *Id.*

I conclude that ch. 48, STATS., imposes on local departments of social services and caseworkers an affirmative obligation to protect the child and his or her family when the juvenile court places the child and the family under the court's protection and the department's supervision. The dispositional order entered by the juvenile court in this case required the Dane County Department of Social Services to supervise Robby and to maintain his placement in a designated out-of-home facility. That order was still in effect when the caseworker returned Robby to his home over his father's and his stepmother's objections, and without court approval. As far as the juvenile court knew, Robby was still placed at Bockari House.

Respondents failed to comply with the dispositional order and the applicable rules and statutes. WISCONSIN ADM. CODE § HSS 58.03(12) defines supervision as:

955

[A] court disposition under which a youth is provided community services by the department, another lead agency or by a suitable adult *under conditions prescribed by the court* and which are designed for the physical, mental and moral well-being and behavior of the youth and *include reasonable requirements for the youth's conduct and the conduct of his or her parents, guardian or legal custodian.*

(Emphasis added.)

Section 48.01(2), STATS., provides:

This chapter shall be liberally construed to effect the objectives contained in this section. The best interests of the child shall always be of paramount consideration, *but the court shall also consider the interest of the parents or guardian of the child,* the interest of the person or persons with whom the child has been placed for adoption and the interests of the public.

(Emphasis added.)

I conclude that Wisconsin's child protection statutes require that the state and its agents do more than merely stand by when children and their families are at-risk.[8] In this case, the common-law duty of Robby's

---

[8] The *DeShaney* Court left open this avenue by not deciding the precise question. In footnote 2, the Court stated:

Petitioners also argue that the Wisconsin child protection statutes gave Joshua an "entitlement" to receive protective services in accordance with the terms of the statute, an entitlement which would enjoy due process protection against state deprivation under our decision in *Board of Regents of State College v. Roth*, 408 U.S. 564 (1972). But this argument is made for the first time in petitioners' brief to this Court: it was not pleaded in the complaint, argued to the Court of Appeals as a ground for reversing the District Court, or raised in the petition for certiorari. We therefore decline to consider it here.

parents to care for Robby broke down. The state stepped in as *parens patriae.* "From early times in our law, the sovereign has been considered to be *parens patriae* of destitute or abandoned children . . . ." *Bartels v. County of Westchester,* 429 N.Y.S.2d 906, 908 (N.Y. Sup. Ct. 1980). In the instant case, the state placed Robby and his family under the protection of the juvenile court and the supervision of the department. However, the state's agents showed a reckless indifference to the physical safety of Robby and his family. That indifference is sanctionable under the due process clause through 42 U.S.C. § 1983. I do not believe that the state can relinquish its protective role when it falters.

Chief Justice Rehnquist concluded that any affirmative duty to an individual the state has under the due process clause must derive entirely "from the limitation . . . imposed on his freedom to act on his own behalf." *DeShaney,* 489 U.S. at 200. When the state judged Robby delinquent and placed him outside his home for care and treatment, it asserted its pre-emptive *parens patriae* role. Professor Soifer points to the "pre-emptive quality of the state's initial protective decision." 57 GEO. WASH. L. REV. at 1518. In an earlier opinion, *Schall v. Martin,* 467 U.S. 253, 265 (1984), Chief Justice Rehnquist stated: "Children, by definition, are not assumed to have the capacity to take care of themselves. They are assumed to be subject to the control of their parents, and if parental control falters, *the State must play its part as parens patriae.*" (Emphasis added.)

In this case, not only did the Joneses' parental control falter, the State in its role as *parens patriae*

489 U.S. at 195 n.2 (citations omitted).

likewise faltered. However, Robby's father and step-mother were not free to protect themselves from the potential danger Robby presented by seeking the only realistic protection they had. Under § 48.13(4), STATS., Children In Need of Protection or Services (CHIPS), a parent may petition the department of social services to assume the role of a child's parents when parental control falters. That option was not available to Robby's father and stepmother because the juvenile court determined that Robby was delinquent and not a child in need of protection or services. The dispositional order which the juvenile court had entered October 19, 1981, remained in effect. Robby's father and step-mother were told by the caseworker that they had no choice but to accept Robby back into their home. They no longer had the option, so they believed, of requiring the department to provide treatment for Robby outside of their home. For these reasons, I conclude that respondents deprived appellants of their liberty inter-est in their personal safety under the due process cause.

## PROCEDURAL DUE PROCESS

Respondents argue that we should not consider appellants' procedural due process claim because that claim was not raised in the trial court. I conclude other-wise. Appellants allege facts which form the basis for a procedural due process claim.

Appellants argue that respondents deprived them of procedural due process when they failed to give Robby, his father and his stepmother notice and an opportunity to object to Robby's change of placement, as required by § 48.357(1), STATS.[9] The majority con-

---

[9] Section 48.357(1), STATS., provides:

cedes that the purpose of the statute is to give persons affected by a change in placement of a child an opportunity to object. However, they contend that because the caseworker's failure to comply with § 48.357(1) was a "random and unauthorized act," appellants have no cause of action under 42 U.S.C. § 1983 for deprivation of their right to adequate process unless they can show that they do not have an adequate post-deprivation remedy under state law. It is critical to remember that the "random and unauthorized act" doctrine applies only to procedural due process. In this case, appellants' procedural and substantive due process rights overlap. Respondents' failure to give Robby's father and step-

---

The person or agency primarily responsible for implementing the dispositional order may request a change in the placement of the child, whether or not the change requested is authorized in the dispositional order and shall cause written notice to be sent to the child or the child's counsel or guardian ad litem, parent, foster parent, guardian and legal custodian. The notice shall contain the name and address of the new placement, the reasons for the change in placement, a statement describing why the new placement is preferable to the present placement and a statement of how the new placement satisfies objectives of the treatment plan ordered by the court. Any person receiving the notice under this subsection or notice of the specific foster or treatment foster placement under s. 48.355 (2) (b) 2. may obtain a hearing on the matter by filing an objection with the court within 10 days of receipt of the notice. Placements shall not be changed until 10 days after such notice is sent to the court unless the parent, guardian or legal custodian and the child, if 12 or more years of age, sign written waivers of objection, except that placement changes which were authorized in the dispositional order may be made immediately if notice is given as required in this subsection. In addition, a hearing is not required for placement changes authorized in the dispositional order except where an objection filed by a person who received notice alleges that new information is available which affects the advisability of the court's dispositional order. If a hearing is held under this subsection and the change in placement would remove a child from a foster home, the foster parent may submit a written statement prior to the hearing.

mother an opportunity to object to placing a dangerous person in their home was as arbitrary and capricious as the placement itself.

The due process clause does not create a property or liberty interest; nor does the Fourteenth Amendment prevent the state from adversely affecting such an interest. The due process clause provides: "No *State* . . . shall . . . deprive any person of life, liberty, or property, *without due process of law.*" (Emphasis added.) Due process requires reasonable notice and a fair opportunity to be heard. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985).

Title 42 U.S.C. § 1983 provides in part:

> Every *person* who, under color of [law] . . . subjects, or causes to be subjected . . . [a] person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

(Emphasis added.)

Section 1983 does not confer any constitutional right upon anyone; it is how the constitutional right is enforced. Section 1983 is a part of a statute denominated "An Act to enforce the Fourteenth Amendment." *See Monroe v. Pape*, 365 U.S. 167, 171 (1961), *overruled in part by Monell v. Department of Social Servs.*, 436 U.S. 658, 700 (1978) (overruling "*Monroe* insofar as it holds that local governments are not 'persons' who may be defendants in § 1983 suits.").

Bear with me a moment while I usurp the power of the legislature and repeal § 48.357(1), STATS. Could the department or the caseworker then remove a child from his or her home without notice and an opportunity to be heard? Obviously not; the constitution forbids it.

Could the department or caseworker place a child outside his or her home and change that placement without notice to the child, his or her parents, or the child's guardian ad litem, and without an opportunity to be heard? The majority is willing to concede that neither the state nor its agents could do so. The right to notice and an opportunity to be heard is not conferred by § 48.357(1) but by the constitution.

Without § 48.357(1), STATS., consider the legal effect of depriving the child or his or her parents of notice and the right to be heard on any dislocation of the family. The due process clause says "[n]o *State*" shall do such a thing, "without due process of law." But before § 1983 was enacted, a person deprived of a constitutional right had no way to punish the state or its officers for depriving him or her of a constitutional right. After § 1983 was enacted, however, a person deprived of a constitutional right—due process, for example—has a right to penalize "[e]very *person*" who deprives him or her of a constitutional right, so long as the deprivation is under color of law. After my repeal of § 48.357(1), Robby, his father and his stepmother still had a cause of action under § 1983 against respondents for depriving them of a liberty interest *without due process of law*. Can anyone seriously argue that a person has less protection of his or her constitutional rights if states and local governments enact due process procedures to protect those rights? That, however, is the effect of the majority's argument. Their fallacious argument stems from their failure to understand *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled by Daniels v. Williams*, 474 U.S. 327 (1986); *Hudson v. Palmer*, 468 U.S. 517 (1984); and *Zinermon v. Burch*, 494 U.S. 113 (1990). I cannot emphasize too strongly that the "random and unauthorized" exception to the procedu-

ral component of the due process clause does not apply when the state has provided notice and an opportunity to be heard before it deprives a person of life, liberty or property. Nor does it apply when the state could have provided constitutionally sufficient process but failed to do so. The Supreme Court had made this clear in *Zinermon*.

Certainly, *Zinermon* makes clear that "when [state] officials fail to provide constitutionally required procedural safeguards to a person whom they deprive of liberty, the state officials cannot then escape liability by invoking *Parratt* and *Hudson*." 494 U.S. at 135. The Court found it strange, as do I, "to allow state officials to escape § 1983 liability for failing to provide [or follow] constitutionally required procedural protections by assuming that those procedures would be futile because the same state officials would find a way to subvert them." *Id.* at 137-38. I find it even stranger that a state official may secure immunity from § 1983 liability by refusing to follow due process procedures mandated by the legislature.

I recognize the precedent of *Irby v. Macht*, 184 Wis. 2d 831, 522 N.W.2d 9, *cert. denied*, 115 S. Ct. 590 (1994). Irby was a prisoner who claimed the prison disciplinary committee violated his right to procedural due process when it failed to follow WIS. ADM. CODE Ch. DOC 303. *Irby* is no longer precedential because the case relied on by the court—*Hewitt v. Helms*, 459 U.S. 460 (1983)—has been abandoned by the United States Supreme Court as the test to determine whether an inmate has a liberty interest protected by the due process clause. *Sandin v. Conner*, 115 S. Ct. 2293 (1995). Henceforth, an inmate's right to constitutional protection will depend on whether the restriction "imposes [an] atypical and significant hardship on the inmate in

relation to the ordinary incidents of prison life." *Id.* at 2300.

It is impossible to know whether the philosophy of *Sandin* will extend to determinations of liberty and property interests in areas other than prison discipline. If the Court returns to fundamental procedural due process jurisprudence, as it did in *Sandin*, the "random and unauthorized act" exception will be largely a thing of the past. The Court said: "The time has come to return to those due process principles that were correctly established and applied in [*Wolff v. McDonnell*, 418 U.S. 539 (1974) and *Meachum v. Fano*, 427 U.S. 215 (1976)]." *Id.* at 2295. Liberty and property interests will no longer depend on a mechanistic formula but upon substance.

The private interest which an individual has in a liberty or property interest does not always mandate pre-deprivation notice and opportunity to be heard. The government's interest may outweigh the private interest, or the risk of an erroneous deprivation of the private interest may be increased by the procedures used or additional substitute procedural safeguards may cost more than their value. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), *quoted in Zinermon*, 494 U.S. at 127.

When the Supreme Court has applied the *Mathews v. Eldridge* test, it "usually has held that the Constitution requires some kind of hearing *before* the State deprives a person of liberty or property." *Zinermon*, 494 U.S. at 127 (citing *Loudermill*, 470 U.S. at 542 (" '[T]he root requirement' of the Due Process Clause" is " 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant protected interest.' ") (emphasis added)).

"[A]t minimum, due process requires '*some* kind of notice and . . . *some* kind of hearing.' " *Id.* at 127 (quoting *Goss v. Lopez*, 419 U.S. 565, 579 (1975) (emphasis added)). However, " 'the necessity of quick action by the State or the impracticality of providing any predeprivation process' may mean that a postdeprivation remedy is constitutionally adequate." *Id.* at 128 (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (quoting *Parratt*, 451 U.S. at 539)).

*Parratt* is not an exception to the *Mathews v. Eldridge* analysis. *Zinermon*, 494 U.S. at 129. It is "rather an application of that test to the unusual case in which one of the variables in the *Mathews* equation—the value of pre-deprivation safeguards—is negligible in preventing the kind of deprivation at issue." *Id.*

The *Mathews* test requires that to determine what procedural protections the constitution requires in a particular case, the court must weigh several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Zinermon*, 494 U.S. at 127 (quoting *Mathews*, 424 U.S. at 335).

In this case, the private interest affected is enormous; it involves the integrity of the family, which is clearly protected by the constitution. *See Santosky v. Kramer*, 455 U.S. 745 (1982). Section 48.357(1), STATS.,

is admirably constructed to correct an erroneous deprivation of such an interest. The notice required thereunder must inform the child or the child's counsel or guardian ad litem, parent, guardian or legal custodian of the reasons for the change in placement, including a statement describing why the new placement is preferable to the present placement and a statement of how the new placement satisfies objectives of the treatment plan ordered by the court. Thus, the caseworker or the agency must justify the change of placement, and the child, his or her representatives and the family must have an opportunity to object to the change in placement.

The government's interest may outweigh the private interest if emergency conditions necessitate an immediate change in the placement of the child placed outside the home. *See* § 48.357(2), STATS. Respondents do not claim that Robby's change of placement was due to emergency conditions.

Under the *Mathews v. Eldridge* balancing test, the private interests of Robby and his family substantially outweigh the government's interest. Thus, the constitution required some kind of a hearing *before* the state changed Robby's placement. Appellants' rights to procedural due process were violated because Robby's change of placement was made without notice to Robby and his family and without an opportunity to object.

## STATE-LAW TORT ACTION

The jury found that the caseworker was negligent but that his negligence was not a cause of appellants' injuries. This finding as to cause is erroneous as a matter of law and the trial court should have changed the jury's answer to this question.

The Wisconsin test as to "cause" has been well articulated by decisions of the Wisconsin Supreme Court. Professor Richard V. Campbell traced the early development of the law in *Recent Developments of the Law of Negligence in Wisconsin*, 1955 WIS. L. REV. 6. He concluded that *Pfeifer v. Standard Gateway Theater, Inc.*, 262 Wis. 229, 55 N.W.2d 29 (1952), established a procedure in tune with substantive law. 1955 WIS. L. REV. at 37. That court prescribed an instruction on proximate or legal cause which rejected the use of the term "proximate cause" in favor of "substantial factor." 262 Wis. at 237, 55 N.W.2d at 33. Professor Campbell concluded that, "[t]his [instruction] brings the law in action and the law in words together." 1955 WIS. L. REV. at 37.

The Seventh Circuit Court of Appeals noted that the Wisconsin Supreme Court has overturned jury verdicts in several cases where the jury found that the negligence of a party was not causal. *Fietzer v. Ford Motor Co.*, 590 F.2d 215, 218 (7th Cir. 1978). In *Sampson v. Laskin*, 66 Wis. 2d 318, 224 N.W.2d 594 (1975), the jury found that the plaintiffs were negligent but their negligence was not the cause of the death and injuries involved. The court concluded that that finding could not stand. *Id.* at 328, 224 N.W.2d at 599. I need not detail the facts relied on by the court except to note that the facts were undisputed. The court concluded, however, that plaintiffs were guilty of contributory negligence. The court reversed and remanded the case for a new trial on the issue of comparative negligence.

In the cases in which the supreme court has set aside a jury finding of lack of cause, the real issue was contributory negligence. That is the issue in this case.

When the jury determines that the defendant is negligent, it resolves the disputed issues of fact as to

that issue. In previous cases, the supreme court has reviewed the facts and determined as a matter of law that a party's negligence was a cause of plaintiff's injuries. *See Miles v. Ace Van Lines & Movers, Inc.*, 72 Wis. 2d 538, 241 N.W.2d 186 (1976); *Mustas v. Inland Constr., Inc.*, 19 Wis. 2d 194, 120 N.W.2d 95 (1963); *Wittig v. Kepler*, 275 Wis. 415, 82 N.W.2d 341 (1957).

In this case, the jury found that respondents' acts were negligent. Those acts can only have included respondents' return of Robby to his home without informing appellants that he was still using drugs and that his behavior was potentially violent and dangerous.

It is not accurate to state that whether a party's negligence was the cause of an injury is a question of fact. The jury may decide the question but only "in any case in which it may reasonably differ on the issue." RESTATEMENT (SECOND) OF TORTS § 434(2) (1965). "It is the function of the court to determine . . . whether the evidence as to the facts makes an issue upon which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff." *Id.* at § 434(1)(a).

The Wisconsin Supreme Court has not accorded a jury's finding of lack of causation the traditional respect an appellate court gives to the findings of a jury. In fact, the court has frequently made a *de novo* review of the evidence and set aside a jury finding of lack of cause where the finding "is contrary to the evidence and is based only on conjecture." *Wittig*, 275 Wis. at 419, 82 N.W.2d at 344; *see also Hatch v. Smail*, 249 Wis. 183, 189-90, 23 N.W.2d 460, 463 (1946). In the latter case, the trial court submitted the question of cause to the jury which found that defendant's negligence was a substantial factor in causing plaintiff's

injury. The court said, however: "It may well be under the facts of this case that the court might have determined causation as a matter of law." *Id.*

The reviewing court must assume that the jury has resolved disputed issues of fact in favor of the plaintiff if it finds defendant negligent. There may, however, be cases in which defendant's negligence is more or less abstract and is not tied concretely to the question of cause. In that case, the reviewing court should be loathe to change the jury's finding. That is not the case here. The caseworker's negligence lies in forcing the Joneses to accept Robby back into their home even though he knew or should have known that Robby was dangerous to society and to the members of his family, especially his stepmother. The situation in which the caseworker placed Robby and his family well fits the metaphorical snake pit alluded to by Judge Posner in *Bowers v. DeVito*, 686 F.2d at 618: "If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."

In the instructions and verdict conference, plaintiffs argued that the pattern instruction—WIS J I—CIVIL 1500 (Cause)[10]—would confuse the jury. The

---

[10] WISCONSIN J I— CIVIL 1500 (Cause) reads:

The cause questions ask whether there was a causal connection between the negligence of any person and the (accident) (injury). These questions do not ask about "the cause" but rather "a cause." The reason for this is that there may be more than one cause of an (accident)(injury). The negligence of one person may cause an (accident)(injury), or the combined negligence of two or more persons may cause it. Before you find that (any)(a) person's negligence was a cause of the (accident)(injury), you must find that

trial court rejected appellants' request for an amended jury instruction.

The trial court has broad discretion when instructing a jury. *Fischer v. Ganju*, 168 Wis. 2d 834, 849, 485 N.W.2d 10, 16 (1992). If the overall meaning communicated by the instructions is a correct statement of the law, no grounds for reversal exist. *Id.* at 850, 485 N.W.2d at 16. Plainly, the instruction submitted confused the jury. The jury asked for additional instructions from the court on two questions:

> 1. Does "a cause" refer to neglectful action being a direct contributing factor in building the situation, the outcome of which was the injury?
> 2. Does "a cause" refer to neglectful inaction, which may have prevented the construction of any hypothetical situation in which (similar) injury may have occurred?

The trial court simply instructed the jury to re-read the instruction the court had given. Two jurors dissented on the cause questions. I cannot conclude that the trial court erroneously exercised its discretion when it declined to elaborate on the instruction which the court gave. The jury's first question is understandable but the second is incomprehensible. There was greater danger in attempting to answer these questions than directing the jury to re-read the instruction. While I do not believe that the pattern instruction erroneously informed the jury as to the law, I believe the instruction could be more complete. For example, the instruction could define "substantial factor." The most confusing aspect of "causation" is that the acts of more

the negligence was a substantial factor in producing the (accident) (injury).

than one person may cause an injury. I suggest a definition of "substantial factor" as follows:

> "Substantial factor" means that defendant's conduct contributed in a significant way to the injury suffered by the plaintiff. Defendant's conduct may be a "substantial factor" even if the conduct of another person or persons also contributed to plaintiff's injuries.

I believe that by objecting to the pattern instruction and requesting an amended instruction, the plaintiffs preserved for appellate review their claim that respondents' acts constituted a substantial factor in causing appellants' injuries. *See Fischer*, 168 Wis. 2d at 849, 485 N.W.2d at 15-16 (citing *In re C.E.W.*, 124 Wis. 2d 47, 54, 368 N.W.2d 47, 51 (1985)); *see also Douglas v. Dewey*, 154 Wis. 2d 451, 463-68, 453 N.W.2d 500, 505-07 (Ct. App. 1990).

I do not believe that a new trial is necessary. We can conclude as a matter of law that respondents' negligence was a cause of appellants' injuries. I would reverse the judgment and remand this cause to the trial court with instructions to change the jury's answer as to the cause questions.

For the reasons set forth in this opinion, I respectfully dissent.