Jean URBACH, Individually and as Representative of the Estate and Surviving Heirs of Keith Urbach, Deceased, Plaintiff/Respondent,

v.

The OKONITE COMPANY, Defendant/Appellant.

No. ED 104393

Missouri Court of Appeals, Eastern District.

FILED: March 28, 2017

William R. Irwin, Timothy L. Krippner (co-counsel), St. Louis, Missouri, for Appellant.

Randy L. Gori, John B. Julian (co-counsel), Edwardsville, Illinois, for Respondent.

## OPINION

Lisa S. Van Amburg, Judge

The Okonite Company, Inc. (Okonite) appeals from a judgment of the Circuit Court of the City of St. Louis entered in favor of Jean Urbach. We affirm.

### Background and Procedural History

Plaintiff Jean Urbach brought claims of negligence, strict liability, willful and wanton misconduct, and loss of consortium against Okonite and twenty-eight other defendants,[1] claiming that the defendants' products caused her husband, Keith Urbach (Urbach), to be exposed to asbestos fibers during his career as an electrician from 1963 to 2001. Plaintiff alleged Urbach's inhalation of respirable asbestos fibers from the defendants' products caused Urbach to develop mesothelioma, which was diagnosed in August 2011, and that this disease caused his death in February 2012. Plaintiff specifically claimed that Okonite-brand asbestos fixture wire contributed to Urbach's death.

---

1. Okonite was the sole defendant at trial.

Urbach died before he was able to testify about his exposure to asbestos-containing products. Therefore, Plaintiff introduced evidence of exposure through the videotaped depositions of Urbach's co-workers and union brothers, Thomas Kepler (Kepler) and Joseph Strenger (Strenger). These depositions were the subject of several motions to strike, in which Okonite argued that portions of the testimony were improper because they were speculative and included opinion testimony by a lay witness. The trial court denied the motions, and the testimony was presented to the jury.

Generally, both Kepler and Strenger testified about the tasks performed by electricians on large commercial projects and how electricians were divided into crews that performed discrete tasks. They also testified about the products they used or with which they came into contact at the various work sites, many of which Urbach also used. The product attributed to Okonite was fixture wire that Urbach's co-workers referred to as "asbestos fixture wire." Okonite denies selling any asbestos-containing fixture wire or any other type of asbestos-containing wire that would be used for lighting fixtures.

Kepler testified that he worked at a number of job sites with Urbach, including the Columbia Generating Station, the University of Wisconsin Hospital, the Oscar Meyer plant, the Byron Nuclear Plant, the Arthur Andersen building, the American Family Insurance project, and a bowling alley remodeling project. Kepler testified that he and Urbach worked together on the fixture crew on the American Family Insurance project and that they used asbestos fixture wire. Kepler testified that he and Urbach installed approximately eight miles of lighting fixtures over the course of a year and a half on that project. He testified that he knew the fixture wire on the project contained asbestos based on his observation of the wire and the fact that the wire was harder to strip. He identified Carol and Okonite as the brand names of fixture wire he had used over the course of his career. However, he was unable to identify the specific brand name of the fixture wire used for the American Family Insurance project.

Although Kepler did not have any independent recollection of Urbach working with Okonite-brand fixture wire, he opined that any fixture wire that Urbach would have handled would have contained asbestos. This included the work he and Urbach performed hanging light fixtures at the University of Wisconsin Hospital, where he and Urbach also performed piping and wiring work in addition to hanging fixtures.

Strenger was also assigned to many of the same job sites as Urbach over the course of Urbach's career, although he was not assigned to the same crew as Urbach at any of the sites. At the University of Wisconsin Hospital, Strenger testified that he was assigned to the light fixture crew, while Urbach was assigned to the switchgear unit. Strenger recalled Urbach visiting and talking with Strenger every once in a while during a break while Strenger was cutting and stripping Okonite-brand "asbestos" fixture wires and performing other fixture work. Strenger testified he was on a ladder underneath the fixture when he worked with the fixture wire. When stripping fixture wire, Strenger testified that debris would fall into his mouth and onto the floor. Strenger testified that he would continue working with and stripping the fixture wire during Urbach's visits. However, Strenger could not testify as to the number of times Urbach visited Strenger during the time they periodically worked together at the University of Wis-

consin Hospital, nor could he testify as to the duration of each visit.

Urbach worked on a team of electricians at the University of Wisconsin during the 1990s for about ten years, and Strenger testified that he was periodically assigned to short-term projects at that location. He opined that Urbach, as a member of the university's crew of electricians, would not have gone more than two days without working on a fixture. This would necessarily involve using asbestos fixture wire.

Strenger testified that in the course of an electrician's duties hanging fixtures, the electrician would cut and strip fixture wire on a daily basis, although he was unable to assign a percentage to that type of work over the course of his career. He recalled the fixture wire he generally used as being manufactured by Okonite, and he testified that he believed fixture wire generally contained asbestos because everyone in the industry, including his foreman, called it "asbestos wire." Specifically, Strenger testified "[The fixture wire was called asbestos wire] [o]n every job I've ever been on. And I'm going back to the first day I walked on a job site as an electrician, and the foreman told me get the asbestos fixture wire." Based on this characterization of the wire, Strenger believed it contained asbestos.

Three experts testified on Plaintiff's behalf, Dr. Arnold Brody, Dr. John Maddox, and Steven Hayes. None of the experts testified that Okonite wire contributed to Urbach's mesothelioma. Dr. Brody's testimony primarily concerned background information regarding asbestos, how mesothelioma develops, and the causal link between asbestos exposure and mesothelioma on a molecular and cellular level. He testified about how asbestos enters the lungs and causes cancer when inhaled in sufficient quantities. He opined that the cumulative asbestos exposure that Urbach experienced throughout his working history was the cause of his mesothelioma.

Dr. Maddox testified about how mesothelioma is diagnosed, how the disease progresses, the latency period for the disease to develop, and the prognosis of patients with the disease. He opined that a person's cumulative asbestos exposure determines their overall risk for developing malignant mesothelioma. Dr. Maddox reviewed Urbach's medical records and pathology material and concluded to a reasonable degree of medical certainty that Urbach had malignant mesothelioma, which ultimately caused his death. He opined that based on his examination of Urbach's lung tissue and Urbach's exposure history, Urbach's mesothelioma was caused by exposure to asbestos.

Plaintiff's industrial hygienist, Steven Hays, testified about his experience testing asbestos-containing products for the release of fibers. He testified that "AF wire" was asbestos fixture wire and was the same type of wire described by Strenger and Kepler. He testified that based on his examination of a photograph of asbestos fixture wire, the insulation on asbestos fixture wire was fibrous and that asbestos fibers would be released into a worker's breathing zone by that worker handling the wire. Mr. Hays specifically discussed Strenger's testimony describing his use of Okonite-brand asbestos fixture wire while Urbach was present as a bystander. Mr. Hays opined that the fibers released by Strenger while working on the fixture wire would exceed the permissible exposure limit set by the Occupational Safety and Health Administration and that Urbach would have been exposed to such levels as a bystander.

Prior to the case being submitted to the jury, Okonite filed a motion for directed verdict, which the trial court denied. The

jury returned a verdict in favor of Plaintiff in the amount of $4,165,000, including an award of $1,825,000 for post-death loss of society and companionship. It apportioned 5% fault to Okonite, resulting in a total jury verdict against Okonite in the amount of $208,250.

Following the verdict, Okonite filed a motion for judgment notwithstanding the verdict (JNOV). It argued that Plaintiff failed to present competent evidence to support her claims sufficient to make a submissible case to the jury. It argued in the alternative that the judgment be amended in accordance with Wisconsin's comparative fault statute and reduced in accordance with Wisconsin's damages cap. Okonite also filed a motion to compel assignment of Plaintiff's asbestos bankruptcy trust claims, arguing that under Wisconsin law, a plaintiff who obtains a verdict on a claim involving an injury due to asbestos exposure may not collect any amount of the judgment until she assigns to the defendant all future rights or claims she has or may have for a personal injury claim against an asbestos bankruptcy trust. The trial court denied all of Okonite's motions, and this appeal follows.

## Discussion

Okonite raises four points on appeal. In Point I, it argues the trial court erred by denying Okonite's motions to strike and by allowing Plaintiff to introduce opinion testimony by lay co-worker fact witnesses. In Point II, Okonite argues that the trial court erred when it denied Okonite's motion for directed verdict and for judgment notwithstanding the verdict because Plaintiff's evidence was insufficient under Wisconsin law to establish causation and, therefore, Plaintiff failed to make a submissible case. Okonite argues in Point III that the trial court erred by entering a judgment that failed to reduce damages for post-death loss of consortium in accordance with Wisconsin's cap on damages awarded in wrongful death actions. In Point IV, Okonite argues the trial court erred by failing to require Plaintiff to assign to Okonite all future rights or claims she had or may have to a personal injury claim against an asbestos bankruptcy trust, as required by Wisconsin law. We affirm the trial court and discuss each point separately.

 Okonite first argues that the trial court erred when it denied Okonite's motions to strike the testimony of Strenger and Kepler because these fact witnesses were permitted to introduce opinion testimony, which was improper. We note, first, that although the parties have agreed that Wisconsin substantive law applies, procedural questions are determined by the state law where the action is brought. *Consol. Fin. Investments, Inc. v. Manion*, 948 S.W.2d 222, 224 (Mo. App. E.D. 1997). Procedural questions include the admissibility of the evidence and the sufficiency of the evidence to go to the jury. *See Rosser v. Standard Mill. Co.*, 312 S.W.2d 106, 110 (Mo. 1958). Therefore, Missouri law controls our determination of whether the trial court allowed the introduction of improper testimony.

 The trial court has substantial discretion in ruling on the admissibility of evidence, and its ruling will not be disturbed on appeal absent an abuse of discretion. *Danneman v. Pickett*, 819 S.W.2d 770, 772 (Mo. App. E.D. 1991). "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991) (citation omitted).

Review of the trial judge's ruling with regard to the admission of evidence is limited to whether the alleged error materially affected the merits of the action. *Vasseghi v. McNutt*, 811 S.W.2d 453, 456 (Mo. App. W.D. 1991). "Error in admitting evidence is not grounds for reversal if it does not prejudice the complaining party or adversely affect the jury in reaching its verdict." *Id.* Evidence is prejudicial if it tends to lead the jury to decide the case on some basis other than the established propositions in the case. *Slusher v. Jack Roach Cadillac, Inc.*, 719 S.W.2d 880, 882 (Mo. App. W.D. 1986).

Although a lay witness is usually precluded from offering opinions, he or she may testify about facts within his or her personal knowledge. *See State v. Sanders*, 842 S.W.2d 916, 919 (Mo. App. E.D. 1992). Thus, generally, a lay witness is permitted to testify as to "perceptible facts" regarding the event in question, such as what he hears, feels, tastes, and smells, as well as what he sees. *See Peterson v. Nat'l Carriers, Inc.*, 972 S.W.2d 349, 356 (Mo. App. W.D. 1998). A lay witnesses must state facts from which the jurors are to form their opinion, but when a witness has personally observed events, he may testify to his "matter of fact" comprehension of what he has seen in a descriptive manner which is actually a conclusion, opinion or inference, if the inference is common and accords with the ordinary experiences of everyday life. *Travelers Indem. Co. v. Woods*, 663 S.W.2d 392, 399 (Mo. App. S.D. 1983).

The testimonies of Strenger and Kepler focused on their experience as electricians who worked at many of the same sites as Urbach. They testified about the types of products they used, the manufacturers of those products, and the frequency of use. Their testimony consisted almost entirely of their personal experience performing electrical work, sometimes doing the same jobs as Urbach. Although Strenger and Kepler occasionally opined as to whether Urbach would have used the same products or would have performed the same tasks, this testimony is not so prejudicial that it tends to lead the jury to decide the case on some basis other than the established propositions in the case. Furthermore, Strenger offered direct testimony of Urbach's bystander exposure to what he characterized as Okonite-brand asbestos fixture wire during his work at the University of Wisconsin Hospital. Furthermore, Kepler offered direct testimony regarding a job where he and Urbach hung eight miles of lighting fixtures using asbestos fixture wire over the course of a year and a half. He also identified Okonite as one of a limited number of brands of asbestos fixture wire he used over the course of his career as an electrician.

A jury is permitted to draw reasonable inferences to determine the existence of causation based on lay witness testimony. *See Wagner v. Bondex Int'l, Inc.*, 368 S.W.3d 340, 348 (Mo. App. W.D. 2012). We see no abuse of discretion in allowing the testimony of Strenger and Kepler with regard to Urbach's exposure to Okonite-brand asbestos fixture wire. Point I is denied.

In Point II, Okonite argues that Plaintiff failed to present sufficient evidence regarding causation to present a submissible case to the jury. The test for causation in Wisconsin is whether the defendant's negligence was a substantial factor in contributing to the result. *Merco Distrib. Corp. v. Commercial Police Alarm Co.*, 84 Wis.2d 455, 267 N.W.2d 652, 654 (1978) (internal citations omitted). The phrase "substantial factor" denotes that the defendant's conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it

as a cause. *Id.*; Restatement, Second, Torts sec. 431, Comment a. p. 429 (1965). There may be more than one substantial causative factor in any given case. *Hart v. State*, 75 Wis.2d 371, 249 N.W.2d 810, 822 (1977).

Wisconsin law requires a plaintiff to prove that the defendant's asbestos-containing product was *a* cause, not *the* cause, of the decedent's asbestos-related disease. *See Horak v. Bldg. Servs. Indus. Sales Co.*, 309 Wis.2d 188, 750 N.W.2d 512, 516–17 (citing *Jones v. Dane Cty*, 195 Wis.2d 892, 537 N.W.2d 74, 84 (App. 1995)) (emphasis added). The following Wisconsin approved jury instruction reflects this notion:

> The cause questions ask whether there was a causal connection between the negligence of any person and the injuries. These questions do not ask about "the cause" but, rather, "a cause." The reason for this is that there may be more than one cause of an injury. The negligence of one person may cause an injury, or the combined negligence of two or more persons may cause it. Before you find that any person's negligence was a cause of the injury, you must find that his negligence was a substantial factor in producing the injury.

*Id.* Causation is a fact question, and a jury may make reasonable inferences, drawn from the circumstances, to determine the existence of causation. *See Jagmin v. Simonds Abrasive Co.*, 61 Wis.2d 60, 211 N.W.2d 810, 822 (1973). However, if there is no credible evidence upon which the trier of fact can make a reasoned choice between two possible inferences, any finding of causation would be in the realm of speculation and conjecture. *Zielinski v. A.P. Green Indus., Inc.*, 263 Wis.2d 294, 661 N.W.2d 491, 497 (App. 2003) (internal citations omitted). "Speculation and conjecture apply to a choice between liability and

nonliability when there is no reasonable basis in the evidence upon which a choice of liability can be made." *Id.* "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Id.*

The question on appeal is whether Plaintiff's evidence is sufficient to support a finding of causation made by the triers of fact in this case. To make a submissible case, a plaintiff must present substantial evidence for every fact essential to liability. *Love v. Hardee's Food Sys., Inc.*, 16 S.W.3d 739, 742 (Mo. App. E.D. 2000). Plaintiff must prove that a defendant's asbestos-containing product was a substantial factor in Urbach's injuries. *See Zielinski*, 661 N.W.2d at 494. "Substantial factor" language provides a standard for the trial court in the exercise of its duty to determine whether a submissible case has been made. *Hagen v. Celotex Corp.*, 816 S.W.2d 667, 673 (Mo. banc 1991). Missouri and Wisconsin law allow a jury to draw reasonable inferences to determine the existence of causation. *Wagner v. Bondex Int'l, Inc.*, 368 S.W.3d 340, 348 (Mo. App. W.D. 2012); *Zielinski*, 661 N.W.2d at 494. However, whether evidence is substantial and whether any inferences drawn are reasonable is a question of law that we review *de novo. Wagner*, 368 S.W.3d at 348; *Zielinski*, 661 N.W.2d at 494.

Keeping these legal standards in mind, we must determine whether Plaintiff has presented credible evidence from which a reasonable person could infer that Urbach was exposed to Okonite's asbestos-containing products. Plaintiff argues that the testimony of Strenger and Kepler establish causation sufficient under Wisconsin law, citing *Zielinski v. A.P. Green Indus., Inc.* and *Horak v. Bldg. Servs. Indus. Sales*

*Co.*, We turn to those and other Wisconsin cases to guide our decision regarding how much evidence is required to establish causation.

In *Zielinski*, the Wisconsin Court of Appeals found that the plaintiffs survived summary judgment as to causation without direct evidence of exposure. 263 Wis.2d 294, 661 N.W.2d 491 (App. 2003). The evidence establishing causation included testimony that the decedent did the type of work that used asbestos and that the decedent's employer "probably bought" asbestos from the defendant. *Id.* at 498. The court held that a jury could reasonably infer that the decedent used the defendant's asbestos-containing product based on evidence that the product was on the employer's approved vendor lists. *Id.* at 496. The court also relied on the testimony of the decedent's co-worker that he knew the decedent, worked on the same shift as the decedent for a period of time, and described the types of jobs both he and the decedent performed as masons. *Id.* at 498. The court held that this testimony, as well as a co-employee's testimony that the defendant's product was "probably" bought for use at the plaintiff's work site because the name rang a bell, was sufficient to create a genuine issue of material fact as to causation. *Id.*

Here, both Strenger and Kepler definitively identified Okonite as a brand of asbestos fixture wire they used as electricians. Furthermore, like the co-workers in *Zielinski*, Strenger and Kepler testified about typical duties undertaken by electricians on any given job, including lighting work that would require the use of asbestos fixture wire. In fact, Kepler testified to performing work on the same fixture crew as Urbach for a year and a half, while Strenger testified that Urbach was present while he worked specifically with Okonite-brand asbestos fixture wire. Mr. Hays, in turn, opined that Urbach would have experienced a level of bystander asbestos exposure sufficient to contribute to his injury during these visits to Strenger.

*Horak v. Bldg. Servs. Indus. Sales Co.* also guides our decision here. 309 Wis.2d 188, 750 N.W.2d 512 (App. 2008). In *Horak*, the decedent died before he could testify regarding his exposure to asbestos-containing products. *Id.* at 513. Therefore, the plaintiff relied on the testimony of a co-worker to establish the decedent's exposure during the course of his work in asbestos installation. *Id.* at 514. The circuit court granted summary judgment in favor of the defendant manufacturer, holding that there was no evidence to establish that the defendant's product ever went to a particular job site worked by the decedent. *Id.* at 513. Therefore, the circuit court reasoned a jury could not make a reasonable inference that the decedent had contact with the defendant's product. *Id.* The Wisconsin Court of Appeals disagreed and found that a jury could reasonably infer exposure because the decedent did the type of work for the employer that used asbestos during the period that the employer purchased asbestos from the defendant manufacturer. *Id.* at 517. It opined that "companies generally do not buy raw material unless they plan on using that raw material in its business." *Id.* at 515. It further held that given the employer's small size and the fact that the decedent was one of the employer's few employees, it would be reasonable for a jury to infer that he used at least some of the defendant manufacturer's asbestos over the course of his employment. *Id.* The court concluded that any jury assessment of causation, viewed in light of the totality of the circumstances, was more than mere speculation and reasonable. *Id.* at 517.

Here, like *Horak*, a jury could—and did—make the reasonable inference that

Urbach was exposed, in part, to asbestos contained in an Okonite product. Testimony presented to the jury established the type of work Urbach performed as an electrician and the products he would have used in that role. Furthermore, Strenger's testimony contains direct evidence of exposure. Specifically, Strenger testified that he used and worked with Okonite-brand asbestos fixture wire while Urbach was present. Mr. Hays testified that the fibers released by Strenger while working on the fixture wire would exceed the permissible exposure limit set by the Occupational Safety and Health Administration, and that Urbach would have been exposed to such levels as a bystander. This direct and circumstantial evidence is sufficient to establish causation under Wisconsin law.

Okonite relies on *Alexander v. Auer Steel & Heating Co.*[2] to argue that Plaintiff cannot rely on evidence establishing the mere possibility that Urbach was exposed to Okonite-brand asbestos-containing fixture wire. No. 2014 AP 335, 2015 WL 519221 (Wis. Ct. App. Feb. 10, 2015). In *Alexander*, both Auer and Milwaukee Stove admitted they sold the asbestos product at issue. *Id.* at *4. The plaintiff also presented testimonial evidence that both Auer and Milwaukee Stove supplied asbestos paper to the decedent's employer. *Id.* Plaintiff argued this permitted a jury to reasonably infer exposure to asbestos paper supplied by either company. *Id.* Plaintiff also presented evidence that both Auer and Milwaukee Stove were the employer's biggest suppliers of sheet metal equipment and that the decedent was observed working with asbestos paper by his employees. *Id.* The Wisconsin court of appeals held that the plaintiff failed to meet her burden on causation. *Id.* at *5. It

focused on the co-worker's testimony, opining that the co-worker "did *not* testify that Auer and Milwaukee Stove, in fact, supplied [the employer] with asbestos paper; rather, he *guessed* that *either* Auer *or* Milwaukee Stove provided the product." *Id.* at *4. The court held that this guess, based solely on the fact that the employer purchased other products from both companies and combined with the plaintiff's other evidence, was insufficient for a jury to infer that either Auer or Milwaukee Stove exposed the decedent to asbestos-containing products. *Id.*

The *Alexander* court also found that the plaintiff, in the absence of direct evidence, failed to present sufficient evidence from which a jury could infer causation. *Id.* The circuit court was troubled by the leap required of the jury to infer causation. *Id.* at *6. It found that linking the fact that the defendant supplied asbestos with the decedent's inhalation of asbestos fibers would require a jury to find that because the defendant was one of possibly two asbestos pipe manufacturers during the relevant time period, the defendant's product probably caused the decedent's injury. *Id.* The circuit court held, and the Wisconsin court of appeals agreed, that this leap of faith took causation out of the realm of possibility and into that of mere possibility. *Id.* The court of appeals held that the plaintiff failed to produce a witness "who can do more than guess" that the pipe used was a particular length that would have identified the defendant as the manufacturer of the product at issue. *Id.* at *7. As a result, the *Alexander* court concluded that "when the matter remains one of pure speculation or conjecture *or the probabilities are at best evenly balanced,* it becomes the duty of the court to direct a verdict for the

**2.** Unpublished opinions issued on or after July 1, 2009 may be cited for persuasive value. *See* Wisconsin Rules of Appellate Procedure, Rule 809.23(3), regarding citation of unpublished opinions.

defendant." *Id.* (internal citations and quotations omitted).

Here, unlike *Alexander*, Plaintiff presented direct evidence of Urbach's bystander exposure to Okonite-brand asbestos fixture wire through the testimony of Strenger. Both Strenger and Kepler testified that they worked with Okonite-brand asbestos fixture wire throughout their careers as electricians, allowing for the reasonable inference that Urbach also worked with this wire while performing similar tasks. Finally, although Plaintiff did not present direct evidence that Okonite sold asbestos-containing fixture wire to Urbach's employers, both Strenger and Kepler identified Okonite as the manufacturer of asbestos fixture wire and described their observations of the wire itself. As a result, the evidence presented by Plaintiff removes the matter out of the realm of pure speculation or conjecture into a reasonable inference of exposure.

The *Zielinski* court refused to adopt a bright-line rule for causation, instead holding that it would decide causation based on the totality of the circumstances. *Zielinski*, 661 N.W.2d at 497. Plaintiff contends that based on the testimony of Strenger and Kepler regarding their experience as electricians on the same job sites as Urbach, a reasonable inference can be made that Urbach performed the same job duties and used the same products. After reviewing the totality of the circumstances in this case, we agree that Plaintiff presented sufficient evidence of causation under Wisconsin law to submit the matter to a jury. Point II is denied.

Okonite argues in Point III that the trial court improperly applied Wisconsin's wrongful death damages cap. The interpretation of a statute is an issue of law and is therefore reviewed *de novo*. *In Re Care and Treatment of Coffman*, 225 S.W.3d 439, 442 (Mo. banc 2007);

*Barker v. Barker*, 98 S.W.3d 532, 534 (Mo. banc 2003). "The primary rule of statutory interpretation is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordinary meaning." *State v. McLaughlin*, 265 S.W.3d 257, 267 (Mo. banc 2008). The relevant provisions of Wisconsin's wrongful death statute, Section 895.04, are set forth below:

(4) Judgment for damages for pecuniary injury from wrongful death may be awarded to any person entitled to bring a wrongful death action. Additional damages not to exceed $500,000 per occurrence in the case of a deceased minor, or $350,000 per occurrence in the case of a deceased adult, for loss of society and companionship may be awarded to the spouse, children or parents of the deceased, or to the siblings of the deceased, if the siblings were minors at the time of the death.

\* \* \*

(7) Damages found by a jury in excess of the maximum amount specified in sub. (4) shall be reduced by the court to such maximum. The aggregate of the damages covered by subs. (4) and (5) shall be diminished under s. 895.045 if the deceased or person entitled to recover is found negligent.

Wis. Stat. Ann. § 895.04 (2016). Here, the jury awarded to Plaintiff $4,165,000 in damages, and $1,825,000 of that amount constituted post-death loss-of-consortium damages under the Wisconsin wrongful death statute. The jury attributed 5% of the fault to Okonite and no fault to Urbach. The trial court entered judgment against Okonite for its 5% proportionate share, and Okonite challenges its portion

of the $1,825,000 judgment for loss of consortium, which totaled $91,250. Okonite argues that in accordance with Wisconsin's wrongful death cap, the trial court should have reduced the $1,825,000 judgment to $350,000, then apportion fault accordingly. The trial court instead held that it did not need to apply the Wisconsin damages cap because the loss of consortium judgment against Okonite was below the $350,000 cap. We agree.

The Wisconsin wrongful death statute is silent regarding the application of the damages cap in light of apportioning liability among defendants, and there is no Wisconsin case law directly on point. However, a few Wisconsin cases provide us with guidance on this issue.

In *Mueller v. Silver Fleet Trucking Co.*, the decedent's wife brought a personal injury action against the defendant, and the jury awarded damages to the wife as follows: $35,000 for pecuniary loss; $5,000 for loss of society and companionship; and $200 for funeral expenses. 254 Wis. 458, 37 N.W.2d 66, 67 (1949). The jury attributed 10% fault to the decedent. *Id.* at 69. The relevant Wisconsin statute capped pecuniary damages at $12,500 and damages for loss of society and companionship at $2,500. *Id.* at 70. The court first applied the cap to the pecuniary and loss of society and companionship awards, which totaled $15,000. *Id.* It then reduced the award by the 10%, or the portion of negligence attributed to the decedent. *Id.* The Wisconsin Supreme Court reversed, holding that the trial court erroneously applied the cap and subsequently apportioned fault. *Id.* It held that a statutory damage cap was not a measure of adequate compensation, but rather a limit to recovery. *Id.* The Wisconsin Supreme Court found that a jury's verdict is not complete until "the necessary mathematical computation has been made" which included the apportionment of liability. *Id.* at 71. As a result, the court held that a trial court must first apportion liability between the plaintiff and defendant, then apply the cap if necessary. *Id.*

In *Chang v. State Farm Mut. Auto. Ins. Co.*, the defendant presented the same argument as Okonite did here. 182 Wis.2d 549, 514 N.W.2d 399, 405 (1994). Specifically, the defendant argued that the statutory maximum is the most that a given class of beneficiaries may recover and that the reductions for the decedent's negligence must be subtracted *after* the cap is applied. *Id.* at 404. The defendant argued the plaintiff's recovery must therefore be less than the statutory maximum in cases of contributory negligence. *Id.* The Supreme Court of Wisconsin disagreed, holding that the statutory maximum was not a measure of damages nor a limit upon the amount of damage which may be awarded by the jury; rather it was a limit only on recovery. *Id.* at 405. As a result, only the *total recovery* was limited by the statutory maximum. Therefore, the plaintiffs in *Chang* were able to prove damages in excess of the statutory maximum, suffer a reduction in those damages for contributory negligence, and still be entitled to collect up to the statutory maximum.

Applying the principles set forth in *Chang* and *Mueller*, we conclude that the trial court correctly apportioned fault before assessing whether to cap the recovery under Wisconsin law. Okonite argues that this interpretation produced absurd results and runs contrary to Wisconsin public policy. Specifically, Okonite argues that the Wisconsin courts focus on the principle of limiting recovery on the part of the plaintiff. Okonite argues a plaintiff's award should be considered as a whole and the cap applied at that time. Okonite further argues that its position does not contradict the holdings in *Chang* and *Mueller* because those cases only involved one defen-

dant, not several defendants, held liable for the damages.

We decline to opine as to the public policy underpinnings of Wisconsin's damages cap for post-death loss of consortium in wrongful death actions. Instead, we defer to the Wisconsin Supreme Court, which has held that in judgments exceeding a statutory cap, a trial court must first apportion fault, then apply the cap. The trial court correctly did so here. Point III is denied.

■■■ In its final point on appeal, Okonite argues the trial court erred when it failed to apply Wisconsin law requiring Plaintiff to assign to Okonite all future rights or claims she has or may have for a personal injury claim against an asbestos bankruptcy trust before collecting any amount of the judgment. The Wisconsin statute at issue is contained within the Wisconsin Code of Civil Procedure and provides as follows:

> If a verdict is entered in favor of the plaintiff in an action subject to this section and the defendant is found to be less than 51 percent causally negligent or responsible for the plaintiff's entire damages under s. 895.045(1) or (3)(d), the plaintiff may not collect any amount of damages until after the plaintiff assigns to the defendant all future rights or claims he or she has or may have for a personal injury claim against an asbestos trust.

§ 802.025(6)(b) (2014). Following the trial court's entry of judgment, Okonite sought assignment of all future rights and claims against asbestos trusts pursuant to the Wisconsin statute.

■■■ The determinative issue here is whether the Wisconsin statute is procedural or substantive in nature. If substantive, we must follow Wisconsin law. How-

ever, if the statute is procedural in nature, Missouri law applies. In Missouri:

> [p]rocedural law prescribes a method of enforcing rights or obtaining redress for their invasion; substantive law creates, defines and regulates rights; the distinction between substantive law and procedural law is that substantive law relates to the rights and duties giving rise to the cause of action, while procedural law is the machinery used for carrying on the suit.

*Sauvain v. Acceptance Indem. Ins. Co.,* 339 S.W.3d 555, 559–60 (Mo. App. W.D. 2011) (internal citations omitted). Similarly, the difference between procedural and substantive law in Wisconsin is described as follows:

> The distinction between substantive and procedural laws is relatively clear. If a statute simply prescribes the method— the "legal machinery"—used in enforcing a right or a remedy, it is procedural. If, however, the law creates, defines or regulates rights or obligations, it is substantive—a change in the substantive law of the state.

*City of Madison v. Town of Madison,* 127 Wis.2d 96, 377 N.W.2d 221, 224 (App. 1985) (internal citations omitted).

The Wisconsin statute at issue requires Plaintiff to assign to Okonite all future rights or claims she has or may have for a personal injury claim against an asbestos trust before she can collect her judgment. Okonite argues the statute is substantive because it confers to Okonite a right to receive this assignment from Plaintiff. We disagree. Plaintiff has the right under Wisconsin law to collect damages awarded by a jury. However, the Wisconsin statute at issue creates a condition precedent to Plaintiff's right to collect from Okonite. This is a procedural hurdle, not a substantive right that Okonite may enforce against Plaintiff. As a result, Missouri law, which

does not have such a procedural hurdle in place, applies.

The trial court properly denied Okonite's motion to prevent Plaintiff from collecting her judgment until she assigned to Okonite all future rights or claims she had or may have for a personal injury claim against an asbestos bankruptcy trust. Point IV is denied.

## Conclusion

We affirm the following judgments of the trial court: (1) denial of Okonite's motions to strike regarding the testimony of Strenger and Kepler; (2) denial of Okonite's Motions for Directed Verdict and Motion for Judgment Notwithstanding the Verdict; (3) entering a judgment that did not reduce said judgment in accordance with the damages cap under Wisconsin law; and (4) denial of Okonite's motion requesting an order holding Plaintiff could not collect her judgment until she assigned to Okonite all future rights or claims she had or may have for a personal injury claim against an asbestos bankruptcy trust.

Angela T. Quigless, P.J., and Robert G. Dowd, Jr., J., concur.